**NEW YORK STATE DAIRY FOODS, INC.; Crowley Foods, Inc.; Cumberland Farms, Inc.; Elmhurst Dairy, Inc.; Farmland Dairies, Inc.; Stewart's Ice Cream Co., Inc.; Stewart's Processing Corp.; Sunnydale Farms Dairy, Inc.; and Byrne Dairy, Inc., Plaintiffs,**

v.

**NORTHEAST DAIRY COMPACT COMMISSION, and Daniel Smith, Commission Executive Director, Defendants.**

**No. CIV.A. 97–11576–PBS.**

United States District Court, D. Massachusetts.

Nov. 2, 1998.

---

John H. Vetne, Blodgett, MaKechnie & Vetne, Newburyport, MA, Sheldon Weiss, Law Office of Sheldon A. Weiss, Mountainside, NJ, for Crowley Foods, Inc., Cumberland Farms, Inc., Elmhurst Dairy, Inc., Farmland Dairies, IN, Marcus Dairy, Inc., Stewart's Ice Cream, Stewart's Processing, Sunnydale Farms, Inc., Plaintiffs.

Clifford M. Sloan, Michael A. Rotker, Wiley, Rein & Fielding, Washington, DC, for Northeast Dairy Compact Commission, Defendant.

David L. Douglass, Clifford M. Sloan, Michael A. Rotker, Wiley, Rein & Fielding, Washington, DC, John H. Vetne, Blodgett,

MaKechnie & Vetne, Newburyport, MA, Sheldon Weiss, Law Office of Sheldon A. Weiss, Mountainside, NJ, for Daniel Smith, Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This case concerns the pricing of milk distributed in New England. Plaintiffs challenge the regulations promulgated by defendant Northeast Dairy Compact Commission (the "Commission") on three grounds: (1) the pricing scheme, as applied to milk produced, processed and packaged outside of New England but sold to New England customers, constitutes unauthorized regulation of interstate commerce in violation of the Commerce Clause of the United States Constitution because Congress has not consented to such regulation with the requisite unmistakable clarity; (2) the additional administrative assessment imposed under the scheme conflicts with the Northeast Interstate Dairy Compact (the "Compact"); and (3) the participation of New England dairy farmers and processors in the promulgation and administrative review of pricing regulations in which they have a direct and substantial pecuniary interest violates the Due Process Clause.

The parties have cross-moved for summary judgment. After hearing and for the reasons set forth below, the defendants' motion for summary judgment is **ALLOWED**. The plaintiffs' motion for summary judgment is **DENIED.**[1]

## I. BACKGROUND

The Court treats the following facts as undisputed, unless otherwise noted.

### A. The Parties

Plaintiffs include: New York State Dairy Foods, Inc., a non-profit trade association representing New York milk processors and distributors of fluid milk products; five fluid milk processors and distributors that procure raw milk from dairy farms outside of New England and distribute fluid milk in New England; and two New York processors that purchase raw milk from dairy farms outside of New England but do not distribute within New England.[2] Plaintiffs compete in New

---

1. The parties do not dispute that six of the plaintiffs are subject to the pricing regulations and have standing to challenge them and that this Court therefore has jurisdiction to consider their challenges. Defendants move to dismiss, however, with regard to plaintiffs New York State Dairy Foods, Inc., Sunnydale Farms Dairy, Inc., and Stewart's Ice Cream Co., Inc., for lack of standing. Because I hold that the plaintiffs' claims fail on the merits, I need not reach defendants' motion to dismiss the complaint with respect to these three plaintiffs for lack of standing.

2. The Amended and Supplemental Complaint describes the plaintiffs as follows.

   *New York State Dairy Foods, Inc.,* is an incorporated non-profit trade association representing the interests of New York milk processors and distributors of fluid milk products. Some member companies distribute fluid milk in New England, and most purchase raw milk from New York dairy farms.

   *Crowley Foods, Inc.,* owns and operates fluid milk processing and manufacturing plants in New York. Crowley purchases raw milk from dairy farms located outside of New England and distributes fluid milk in New England.

   *Cumberland Farms, Inc.,* owns and operates a fluid milk processing plant in New York. Cumberland purchases raw milk from dairy farms

located outside of New England and distributes fluid milk in New England.

   *Elmhurst Dairy, Inc.,* owns and operates a fluid milk processing plant in New York. Elmhurst bottles milk for its own account and for other dealers. Elmhurst purchases raw milk from dairy milk farms located outside of New England. Fluid milk processed by Elmhurst is sold in New England by an unaffiliated customer, Bartlett Dairy, Inc., a dealer to which Elmhurst sells bottled milk.

   *Farmland Dairies, Inc.,* owns and operates a fluid milk processing plant in New Jersey. Farmland purchases raw milk from dairy farmers located outside of New England and distributes fluid milk in New England.

   *Stewart's Ice Cream, Co., Inc.,* operates retail convenience stores in New England and New York, which are supplied with fluid milk products by its corporate affiliate, Stewart's Processing Corp. Stewart's Ice Cream neither processes milk nor purchases raw milk from dairy farmers.

   *Stewart's Processing Corp.* owns and operates a fluid milk processing plant in New York. Stewart's purchases raw milk from New York farmers and distributes packaged fluid milk products to stores in New York and Vermont.

   *Sunnydale Farms Dairy, Inc.,* owns and operates a fluid milk processing plant in New York. Sunnydale purchases raw milk from dairy farms

York with New England milk plants for raw milk supplies. Plaintiffs collectively account for approximately three percent of all sales of packaged fluid milk in New England.

The Commission is vested with authority to implement the Compact, which is set forth in section 1(b) of S.J. Res. 28, 104th Cong. (1995). In accordance with the terms of the Compact, the Commission is composed of "delegations" from each of the six participating New England states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont. *See* Compact, § 4. Each state's delegation is comprised of three to five individuals and must include at least one dairy farmer and one consumer representative. *See id.* Each delegation is "entitled to one vote in the conduct of the Commission's affairs." *Id.*

## B. *Federal Regulation*

The milk industry is subject to extensive federal regulation. The Agricultural Marketing Agreement Act of 1937 ("AMAA"), as amended, 7 U.S.C. § 601 *et seq.,* ("AMAA") authorizes the Secretary of Agriculture to set the minimum prices that "handlers" (milk processors) must pay to "producers" (dairy farmers) for raw milk in particular geographic areas. These regulations are known as "Federal Milk Marketing Orders." The highest regulated Federal Milk Order prices are charged for "Class I" or "fluid use" milk, which is raw milk used for consumption (as opposed to milk used for manufacturing such dairy products as ice cream, yogurt, cheese and butter, which is characterized as Class II or Class III milk). *See generally West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 188–89 & n. 1, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) (describing the federal milk regulatory scheme). Because the AMAA establishes only the minimum prices that handlers must pay producers, "those prices have not been so high as to prevent substantial competition among producers" in neighboring states. *Id.* at 189, 114 S.Ct. 2205. Efforts by individual states to regulate prices paid to producers

above the federal minimum have been invalidated as unduly burdening interstate commerce in violation of the Commerce Clause. *See id.* at 188, 194–96, 114 S.Ct. 2205 (invalidating a Massachusetts scheme that imposed premium payments on all Class I milk distributed in Massachusetts no matter where it was produced but that provided a subsidy offsetting the payments exclusively to Massachusetts dairy farmers).

## C. *The Compact*

### 1. *The Enactment*

Against this backdrop of failed state regulatory efforts, several northeastern states sought congressional authority to enter into an interstate agreement under the "Compact Clause" of the Constitution, U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress ... enter into any Agreement or Compact with another State ....").

Between 1989 and 1993, the legislatures of the six New England states adopted the Northeast Interstate Dairy Compact, finding that "dramatic price fluctuations, with a pronounced downward trend, threaten the viability and stability of the northeast dairy region." Compact, § 1. Two of the six states—Vermont and Maine—are producer states, i.e., they produce more milk than they consume. The other four states—Massachusetts, Rhode Island, Connecticut and New Hampshire—are consumer states, i.e., they consume more milk than they produce. Although New York and Pennsylvania had participated in negotiating the terms and provisions of the Compact, neither state ultimately joined it.

On June 3, 1996, in the Federal Agriculture Improvement and Reform Act of 1996, Pub.L. No. 104–127, Title I, § 147, 110 Stat. 919 (codified at 7 U.S.C. § 7256), Congress consented to the Compact, which gave the Commission authority to regulate Class I (fluid use) milk. Congress attached seven conditions to its consent, the last of which is the linchpin of the current dispute:

located outside of New England. Sunnydale does not distribute fluid milk in New England.

*Byrne Dairy, Inc.,* owns and operates fluid milk processing plants in New York. Byrne purchases

raw milk from dairy farms located outside of New England and distributes fluid milk in New England.

The Northeast Interstate Dairy Compact Commission shall not prohibit or in any way limit the marketing in the Compact region of any milk or milk product produced in any other production area in the United States. The Compact Commission shall respect and abide by the ongoing procedures between Federal milk marketing orders with respect to the sharing of proceeds from sales within the Compact region of bulk milk, packaged milk, or producer milk originating from outside of the Compact region. The Compact Commission shall not use compensatory payments under section 10(6) of the Compact as a barrier to the entry of milk into the Compact region or for any other purpose. Establishment of a Compact over-order price, in itself, shall not be considered a compensatory payment or a limitation or prohibition on the marketing of milk.

7 U.S.C. § 7256(7).

In a colloquy concerning 7 U.S.C. § 7256, as part of the Senate Conference Report, Senator Leahy and Senator Lugar, Chairman of the Agriculture Committee, stated:

> This compact will allow the six New England states to regulate the price of all class I drinking milk sold in those States. The regulation may apply to any class I milk sold in the New England States but produced elsewhere, as well as to such milk produced by New England farmers. The compact also provides that farmers from beyond New England receive its benefits as well as their New England counterparts.

142 Cong. Rec. S3056 (1996). Senator Leahy and Senator Lugar also noted that congressional consent to the Compact did not "limit the compact commission's authority to establish a compact over-order price regulation for all fluid milk marketed into the compact region in any form, packaged or bulk, produced in another production region in the United States." *Id.* at S3057. The President signed the legislation on April 4, 1996.

**3.** Under the current federal order system, the New England "region" is governed by "Federal

## 2. *The Provisions of the Compact*

The Compact authorizes the Commission to set an "over-order" price, which means a "minimum price required to be paid to producers for Class I milk established by the Commission in regulations adopted pursuant to sections nine and ten of this Compact, which is above the price established in federal marketing orders or by state farm price regulation in the regulated area." Compact, § 2(8); *see also id.* § 9(b); 7 U.S.C. § 7256(2). This minimum price established by the Commission is the "price for milk to be paid by pool plants, partially regulated plants and all other handlers receiving milk from producers located in a regulated area." Compact, § 9(d).

Under the Compact, "region" refers to "the territorial limits of the states which are or become parties to this compact."[3] *Id.* § 2(3). "Regulated area" is defined as "any area within the region governed by and defined in regulations establishing a compact over-order price." *Id.* § 2(5).

The Compact contains provisions regarding the regulation of both "pool" and "partially regulated" plants. A "pool plant" is "any milk plant located in a regulated area." *Id.* § 2(6). A "partially regulated plant" is "a milk plant not located in a regulated area but having Class I distribution within such area, or receipts from producers located in such area." *Id.* § 2(7).

Section 10 of the Compact, entitled "Optional Provisions For Pricing Order," provides, in relevant part:

> Regulations establishing a compact over-order price or a commission marketing order may contain, but shall not be limited to, any of the following:
>
> .   .   .   .   .
>
> (5) Provisions for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered, or for the payment of producers

Milk Marketing Order 1."

delivering milk to the same handler of uniform prices for all milk delivered by them.

> (A) With respect to regulations establishing a compact over-order price, the commission may establish one equalization pool within the regulated area for the sole purpose of equalizing returns to producers throughout the regulated area.

> .    .    .    .    .

> (6) Provisions requiring persons who bring Class I milk into the regulated area to make compensatory payments with respect to all such milk to the extent necessary to equalize the cost of milk purchased by handlers subject to a compact over-order price .... No such provisions shall discriminate against milk producers outside the regulated area. The provisions for compensatory payments may require payment of the difference between the Class I price required to be paid for such milk in the state of production by a federal milk marketing order ... and the Class I price established by the compact over-order price ....

> (7) Provisions specially governing the pricing and pooling of milk handled by partially regulated plants.

> .    .    .    .    .

> (9) Provisions requiring the payment by handlers of an assessment to cover the costs of the administration and enforcement of such order pursuant to Article VII, Section 18(a).

*Id.* § 10(5)(A), (6)-(7), (9).

Before the Commission may invoke its regulatory authority, it must conduct an informal rulemaking proceeding, *see id.* § 11, publish notice of the proceeding in the official register of each participating state, *see id.,* consider specific criteria detailed in the Compact, *see id.* § 9(e), hold a public hearing, *see id.* § 11, and adopt, by a two-thirds majority of the delegations, *see id.* § 5, a written price regulation. The rulemaking proceeding must comply with the requirements of § 553 of the federal Administrative Procedure Act. *See id.* §§ 5, 12; 5 U.S.C. § 553. Once the Commission adopts a regulation, that regulation will only apply to those states that vote affirmatively for it, *see* Compact, § 5, and the terms of any price must meet the approval of two thirds of all eligible producers by formal referendum, *see id.* § 13.

### 3. *The Over–Order Price Regulation*

On May 30, 1997, the Commission adopted an over-order price regulation effective for the six-month period between July 1, 1997, and December 31, 1997. 7 C.F.R. pts. 1300–08, 1381 (1997). In accordance with the Compact's provisions, the Commission published a Federal Register notice and conducted public hearings on the proposed regulation. The six member states voted unanimously in favor of the proposed price regulation, and the Commission conducted a producer referendum, which was passed overwhelmingly. *See* 62 Fed.Reg. 29,646, 29,647 (May 30, 1997).

The regulation established a combined federal Class I and Compact over-order price of $16.94 per hundredweight (cwt).[4] *See* 7 C.F.R. § 1305.1 (1997). The over-order obligation for covered handlers was $3.00 per hundredweight, representing the difference between the announced Compact Class I price ($16.94) and the Federal Milk Marketing Order 1 price ($13.94). *See id.* The amount of the over-order obligation decreases as the federal Class I price increases. For example, between July and December 1997, the federal Class I price increased from $13.94 per hundredweight in July to $16.07 per hundredweight in December. The amount of the Commission's over-order obligation correspondingly declined 71%, from $3.00 per hundredweight in July to $0.87 per hundredweight in December. The Commission applied its over-order price regulation to all Class I fluid milk that was distributed within the regulated area, including milk that was produced and processed outside the region by partially regulated plants.

The Commission also included an additional assessment in the over-order price regula-

---

4. A hundredweight of milk is approximately 8.3 gallons.

tion, pursuant to section 18(a) of the Compact. Section 18(a) provides:

> To provide for its start-up costs, the commission may borrow money pursuant to its general power under section six, subdivision (d), paragraph four. In order to finance the costs of administration and enforcement of this compact, including payback of start-up costs, the commission is hereby empowered to collect an assessment from each handler who purchases milk from producers within the region.... *In addition, if regulations establishing an over-order price or a compact marketing order are adopted, they may include an assessment for the specific purpose of their administration.* These regulations shall provide for establishment of a reserve for the commission's ongoing operating expenses.

Compact, § 18(a) (emphasis added); *see also id.* § 10(9). The assessment is $0.032 per hundredweight, calculated by the Commission based on the quantity of fluid milk products disposed in the regulated area from a pool or partially regulated plant. *See* 7 C.F.R. § 1308.1 (1997).

According to the Commission, plaintiffs Byrne Dairy, Inc., Crowley Foods, Inc., Cumberland Farms, Inc., Elmhurst Dairy, Inc., Farmland Dairies, Inc., and Stewart's Processing Corp., as "covered handlers" under the regulations, are subject to the over-order payment obligation, inclusive of the over-order assessment. *See id.* §§ 1301.6, 1301.9. The first payment was due on or before August 18, 1997. *See id.* § 1307.3(a).[5]

### 4. *The Pooling Scheme*

The Commission's milk regulation authority is premised on the principle of "pooling." *See* Compact, §§ 2(6), 9(b), (d), 10(5)(A), (7); 7 C.F.R. pts. 1306–07. Under the Commission's regulations, the proceeds from the

Class I over-order price surcharge are pooled into a "producer-settlement fund" by the Commission. 7 C.F.R. § 1307.1 These proceeds are then redistributed, in the form of a Compact "over-order producer price," to regulated handlers for disbursement to producers who provided them with raw milk. *Id.* §§ 1306.3, 1307.4. As the Commission has concluded that regulation of both "pool" plants and "partially regulated" plants is contemplated by the terms of the Compact, both are made subject to the over-order price regulation and resultant pooling scheme. *See id.* §§ 1306.1, 1306.2. Pooling thus yields payments from the pool to all producers who provided the milk, regardless of their location; that is, payment of the Compact over-order producer price is made to all dairy farmers supplying pool plants and partially regulated plants. *See id.* §§ 1301.11, 1307.4.

Although the payment obligation into the pool is the same for pool and partially regulated plants, the amounts that the two types of plants receive for redistribution to out-of-region producers are not necessarily equal. Plaintiffs gave the following example of the different economic impact, which the Commission does not dispute. For July 1997, the Compact over-order Class I price was $16.94, $3.00/cwt above the federal Class I price. Under Compact rules, a New York and a New England plant each having 10 million pounds (100,000 cwts)[6] of receipts from New York dairy farmers, with 80% Class I use (80,000 cwts) and equal distribution of packaged milk to New England (40,000 cwts) and New York (40,000 cwts) during the month of July, would have identical over-order obligations of $120,000[7] to the Compact pool for packaged milk distributed in New England. This money would be collected and commingled in the producer-settlement fund, along with all payment obligations of all other reg-

---

**5.** In October 1997, the Commission voted to extend its price regulation of $16.94 per hundredweight for the period of January 1, 1998, through termination of the Commission's authority under the Compact, which is governed by 7 U.S.C. § 7256(3).

**6.** A hundredweight (cwt) is equivalent to 100 pounds. Thus, 10 million pounds is 100,000 cwts.

**7.** The calculation is 40,000 cwts (the volume of packaged milk that the plant distributed in New England during July) × $3.00 over-order obligation. *See* 7 C.F.R. §§ 1306.1, 1306.2 (1997).

ulated handlers, for distribution to producers.

The Commission would disburse from the pool to dairy farmers through the handlers, acting in a conduit capacity. The Commission calculated an "over-order producer price" (i.e., the amount to be paid back to the dairy farmers) of $1.28/cwt for July 1997. Whereas the New England pool plant would receive payment from the pool of $128,000 for redistribution to producers (i.e., $1.28 over-order producer price × total milk receipts of 100,000 cwts), the partially regulated New York plant would receive only $51,200 for redistribution (i.e., $1.28 × 40,000 cwts) on some milk receipts, *see* 7 C.F.R. §§ 1304.5(c)(1), 1307.4(f) (1997), thus placing the New York handler at a $76,800 competitive disadvantage.

Differential redistributions inure to the benefit of producers supplying pool plants because the Compact over-order producer price is uniformly disbursed to all milk producers who provided milk to a pool plant. *See In re Elmhurst Dairy, Inc.*, Nos. HEP–97–007 & –008, at 5. Revenues to be disbursed to these producers are based upon the pool plant's total volume of milk receipts, including milk that is diverted elsewhere for production of manufactured dairy products. By contrast, partially regulated plants receive no revenues for the volume of any packaged milk sold outside of the regulated area or for the volume of milk used for manufacturing. Instead, revenues are based on the partially regulated plant's volume of fluid milk distribution in New England only and are disbursed to producers on a pro rata basis accordingly. *See id.* Because payments from the pool to partially regulated plants are calculated by multiplying the over-order producer price and the receipts destined for Class I milk distribution in New England, the partially regulated plant that diverts some milk to out-of-region plants or for non-fluid use will receive less money for redistribution to producers than similarly situated pool plants. Accordingly, plaintiffs claim that they suffer competitive harm because New York dairy farmers prefer to deal with New England pool plants, which give them a higher payback. This is the beef that generated this suit.

### D. *Administrative Proceedings*

The Compact sets forth the procedures available to handlers who object to the over-order price. *See* Compact, § 16(b). Handlers may file a written petition with the Commission, which triggers the Commission's administrative process, and may request a hearing at that time. *See id.; see also* 7 C.F.R. §§ 1381.1–1381.4(f) (1997). In accordance with Commission regulations, the Chair of the Commission appoints a "Hearing Panel" of one to three Commission members; the Panel must be composed of Commission members "who are not members of the state delegation in which the Handler is incorporated or has its principal place of business, who have no pecuniary interest in the outcome, and who are otherwise fair and impartial." *Id.* § 1381.4(a). The Hearing Panel considers the petition, issues a proposed decision, considers any handler objections thereto, and then renders a final proposed decision. *See id.* § 1381.4(b)-(g). The Hearing Panel's final proposed decision, together with any handlers' objections, is then considered by the Commission, which issues a final ruling on the petition. *See id.* § 1381.4(h). The Commission's regulations provide that "[a]ny commissioner shall (on either the Commissioner's own motion or on motion of the petitioner) disqualify himself or herself from consideration of the Commission's final ruling on the panel's decision if that commissioner's impartiality might reasonably be questioned." *Id.* § 1381.4(h)(3).

### E. *Crowley Petitions*

On August 15, 1997, plaintiffs Crowley Foods, Inc., Farmland Dairies, Inc., Cumberland Farms, Inc., and Stewart's Processing Corp. filed verified administrative petitions (collectively, the "Crowley petitions") with the Commission challenging the lawfulness of the pricing regulations, the requisite producer representation on each state's delegation, the participation on the Hearing Panel of any Commission member who had participated in promulgating the regulations at issue, and the imposition of administrative assessments

on out-of-region handlers.[8]

On August 19, 1997, the Chair of the Commission appointed three Commission members to serve as the Hearing Panel for these petitions. The three appointees were the Chief of the Consumer Protection Division of the Rhode Island Attorney General's Office, the consumer representative from the New Hampshire delegation, and the Chair of the Commission, who was also the consumer representative from the Maine delegation. In accordance with the Commission's regulations, none of the three appointees is from a state in which any petitioner is incorporated or has its principal place of business. On September 9, 1997, the Hearing Panel issued its Proposed Decision on the Crowley petitions, recommending that the Commission deny plaintiffs' claims. On September 19, the Crowley petitioners filed written objections to the Proposed Decision. On September 23, the Hearing Panel issued its Final Proposed Decision.

On September 25, the Commission met and, by a vote of 6–0, adopted the Panel's Final Proposed Decision on the petitions. Later that same day, the Commission issued its Final Decision, rejecting plaintiffs' objections and concluding that: (1) the Commission has the authority to regulate (by imposing an over-order price and administrative assessment on all regulated handlers) all milk distributed in the New England region, including milk that is produced and/or processed outside of the region by partially regulated plants; (2) the application of the over-order pricing and pooling regulation to partially regulated plants does not constitute an impermissible compensatory payment scheme; and (3) the participation of New England farmers and processors in setting the over-order price does not, absent specific allegations of bias, violate the Due Process

Clause. *See In re Crowley Foods, Inc.*, Nos. HEP–97–001, –002, –004 & –005, at 9–20, 24–27.

### F. *Elmhurst Petitions*

Meanwhile, plaintiffs Elmhurst Dairy, Inc., and Byrne Dairy, Inc., filed verified administrative petitions (collectively, the "Elmhurst petitions") challenging most of the same Commission activities and regulations as did the Crowley petitions. Plaintiff Elmhurst raised the additional claim that imposition of the pricing regulations on it was unlawful because its distribution in the region occurred solely through an unaffiliated distributor. On September 25, 1997, the Chair of the Commission appointed the same Hearing Panel as had served on the Crowley petitions. On October 15, 1997, the Panel issued its Proposed Decision on the Elmhurst petitions, recommending that the Commission deny all claims. The Elmhurst petitioners did not file objections, and the Proposed Decision became the Panel's Final Decision. On December 3, 1997, the Commission adopted the Panel's Final Decision by a vote of 6–0. Later that same day, the Commission issued its Final Decision on the petitions, rejecting plaintiffs' claims as it had done in the Crowley decision. The Commission also rejected Elmhurst's additional claim that it was not subject to the Commission's regulatory authority because the fluid milk that it packaged for distribution in the New England region was distributed by an unaffiliated distributor. The Commission reasoned that the involvement of a third-party intermediary does not change the fact that Elmhurst "operates a partially regulated plant that receives milk from producers providing the raw supply" for the sales of packaged milk into the region. *In re Elmhurst Dairy, Inc.*, Nos. HEP–97–007 & –008, at 8–9.

8. In July 1997, eight of the nine plaintiffs had moved for a preliminary injunction to prohibit the Commission from enforcing the over-order price regulation. On August 7, 1997, plaintiffs Crowley Foods, Inc., Farmland Dairies, Inc., and Stewart's Processing Corp. entered into a written agreement with the Commission whereby they consented to withdraw their pending request for injunctive relief, to pay their over-order obligations into a court registry account, and to file administrative petitions with the Commission.

The Commission agreed to issue expedited decisions on the administrative petitions. Meanwhile, the remaining plaintiffs, with no known payment obligations, continued with their request for a preliminary injunction.

On August 13, 1997, this Court issued an order denying the motion for preliminary injunction. *See New York State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n*, No. 97–11576–PBS, Order at 3–4 (D.Mass. Aug. 13, 1997).

## II. DISCUSSION

### A. Standard of Review

Plaintiffs seek judicial review of the Commission's final decisions on the Crowley and Elmhurst petitions. This Court has jurisdiction in equity to determine whether the rulings of the Commission are "in accordance with law." Compact, § 16(c).[9]

### B. Exhaustion

Although the parties have cross-moved for summary judgment pursuant to Fed.R.Civ.P. 56(c), this Court must determine whether the present proceeding is more appropriately considered judicial review of an agency rulemaking based on the administrative record of proceedings conducted by the Commission pursuant to Compact, § 16(c). In particular, the Commission argues that this Court should not consider any extra-record submission by the plaintiffs documenting competitive harm. The resolution of this issue hinges, in part, on whether exhaustion is required.

■ The "general rule" is that parties are required to exhaust prescribed administrative remedies before seeking relief from the courts because exhaustion "serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy v. Madigan,* 503 U.S. 140, 144–45, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). With respect to promoting judicial efficiency, exhaustion of the administrative procedure "may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual contest." *Id.* at 145–46, 112 S.Ct. 1081; *see also Swirsky v. National Ass'n of Sec. Dealers,* 124 F.3d 59, 63 (1st Cir.1997) ("Exhaustion is required if explicitly mandated by Congress, but courts may relax this requirement somewhat where Congress is silent." (citation omitted)). Exhaustion may not be required, however, "where the pursuit of administrative remedies would be futile or inadequate," would "waste resources," and would "work severe irreparable harm on the litigant," or "when the issues raised involve purely legal questions." *Pihl v. Massachusetts Dep't of Educ.,* 9 F.3d 184, 190 (1st Cir.1993).

■ The Commission contends that plaintiffs may not raise any unexhausted claim and that judicial review is limited to review of the Commission's final decisions based on the record it had before it. The Compact provides that an aggrieved handler subject to an order "*may* file a written petition with the commission" claiming that the order is "not in accordance with law." Compact § 16(b) (emphasis added). Section 16(c) provides for federal jurisdiction to review "such ruling" of the Commission on this petition. *Id.* § 16(c). Plaintiffs argue that the use of the permissive word "may" in section 16(b) suggests that Congress did not mandate exhaustion and that this Court should not simply conduct judicial review of an administrative record. However, the word "may" simply connotes that the handler has the option of challenging the order by filing a petition rather than, for example, awaiting an enforcement action. Federal jurisdiction is triggered by a challenge to the Commission's ruling on a petition. Here, the Court concludes that exhaustion is required and that it should review the pricing regulations and other agency rules based on the administrative record before the Commission in order to determine whether the rulemaking was in accordance with law.

As a practical matter, the difference between a review pursuant to Fed.R.Civ.P. 56(c) and an administrative review is not important here because none of the legal challenges turns on questions of fact and none of the extra-record materials concerning the severity of any competitive harm appears relevant to the legal issues raised.

---

9. The Administrative Procedure Act ("APA") defines "agency" as "each authority of the Government of the United States." 5 U.S.C. § 551(1). Here, the Commission is an authority created by an interstate compact among six states with congressional consent. Neither plaintiffs nor defendants argue that the Commission is an agency subject to APA provisions, except as provided by the Compact itself. Because section 16(c) of the Compact does not specifically reference the judicial review standards in the APA, 5 U.S.C. § 706, the Court concludes that these standards are inapplicable.

### C. Statutory Construction

■ The United States Supreme Court has recently reiterated the standard by which courts must review challenges to interstate compacts consented to by Congress:

As we explained long ago, once a compact between States has been approved, ... it is the law of the case binding on the states and its citizens, as fully as if it had been never contested. Indeed, congressional consent transforms an interstate compact within [the Compact] Clause into a law of the United States. Just as if a court were addressing a federal statute, then, the first and last order of business of a court addressing an approved interstate compact is interpreting the compact. [U]nless the compact to which Congress has consented is somehow unconstitutional, no court may order relief inconsistent with its express terms, no matter what the equities of the circumstances might otherwise invite.

*New Jersey v. New York,* 523 U.S. 767, ——, 118 S.Ct. 1726, 1750, 140 L.Ed.2d 993 (1998) (alterations in original) (internal quotations and citations omitted).

This Court is also guided by the equally well-settled principles governing judicial review of an agency's construction of a statute:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnotes omitted). The First Circuit elaborated on the two-stage *Chevron* analysis:

In performing the first part of a *Chevron* analysis, no deference is due. Instead, courts must look primarily to the plain meaning of the statute, drawing its essence from the "particular statutory language at issue, as well as the language and design of the statute as a whole." Beyond this point, it remains unclear whether, and if so, to what extent, a court engaged in the first stage of a *Chevron* inquiry may use other tools of statutory construction, such as legislative history, in searching for Congress' unambiguously expressed intent on a particular issue.

*Strickland v. Commissioner, Me. Dep't of Human Servs.,* 48 F.3d 12, 16–17 & n. 4 (1st Cir.1995) (citations omitted) (assuming that a court may look at legislative history at the initial stage, and noting that courts "may well decide to consider it during the second stage in order to determine whether the agency's interpretation is a permissible one").

■ Although "[a]n agency's formal interpretation, through a rulemaking or an adjudication, of a statute that it administers, is accorded what has come to be known as *Chevron* deference," *Massachusetts v. FDIC,* 102 F.3d 615, 621 (1st Cir.1996), no deference is due if Congress has spoken directly to the question, *see Passamaquoddy Tribe v. Maine,* 75 F.3d 784, 793 (1st Cir.1996). With these principles in mind, the Court turns to the three legal challenges raised by the plaintiffs.

### D. Commerce Clause

Plaintiffs primarily challenge the pricing regulations on the ground that the Commission exceeded its regulatory authority in violation of the Commerce Clause, Article I, Section 8 of the United States Constitution. Plaintiffs claim that the Commission lacks authority to regulate Class I milk produced, processed and packaged outside of New England but distributed within New England.

■ "The Commerce Clause vests Congress with ample power to enact legislation providing for the regulation of prices paid to farmers for their products." *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). Al-

though the "negative" aspect of the Clause limits a state's power to adopt regulations that discriminate against interstate commerce, *see id.*, "[w]hen Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause." *Northeast Bancorp v. Board of Governors*, 472 U.S. 159, 174, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985).

▪ Because of the importance of the constitutional prohibition against economic protectionism, any congressional exemption from the limitations of the Commerce Clause must be crystal clear. *See United Egg Producers v. Department of Agric.*, 77 F.3d 567, 570 (1st Cir.1996) ("The standard for finding Congressional consent is ... high."). The state has the burden of demonstrating the unmistakably clear intent of Congress to allow otherwise discriminatory regulations. *See Wyoming v. Oklahoma*, 502 U.S. 437, 458, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). Accordingly, the Commission has the burden of demonstrating congressional consent to the economic protectionism of the Compact's regulations.

▪ The Commission points to three provisions of its Compact as authority for its regulation of milk produced, processed and packaged outside of the region but distributed within it: sections 10(7), 2(7) and 9(d). The Compact authorizes the Commission to regulate "the pricing and pooling of milk handled by partially regulated plants." Compact, § 10(7). A "partially regulated plant" is, in turn, defined as "*a milk plant not located in a regulated area but having Class I distribution within such area,* or receipts from producers located in such area." *Id.* § 2(7) (emphasis added). Section 9(d) provides that "[t]he commission is hereby empowered to establish the minimum price for milk to be paid by pool plants, *partially regulated plants* and all other handlers receiving milk from producers located in a regulated area." *Id.* § 9(d) (emphasis added).

Plaintiffs argue that the Compact itself is not unmistakably clear. Contending that the phrase "receiving milk from producers located in a regulated area" modifies "pool plants" and "partially regulated plants" as well as "all other handlers," plaintiffs interpret section 9(d) to permit the Commission to regulate only those handlers receiving milk produced in New England. Although better comma placement would have been helpful, the lack of a comma after "partially regulated plants" is not dispositive. Such an interpretation would exempt from regulation those plants that meet the first half of the disjunctive definition of a partially regulated plant in section 2(7) of the Compact. This construction would be nonsensical and contrary to the logic of the Compact. *Cf. United States v. Carroll*, 105 F.3d 740, 744 n. 3 (1st Cir.1997) (discussing the court's power to repunctuate "to render the true meaning of a statute" (quoting *United States Nat'l Bank v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 462, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993))), *cert. denied,* —— U.S. ——, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997).

Plaintiffs' stronger argument is that the over-order pricing scheme, as applied to partially regulated plants, is unlawful because such regulations require "compensatory payments" under the Compact and "limit" the marketing of milk produced in other areas, both of which Congress explicitly prohibited in its consent to the Compact, *see* 7 U.S.C. § 7256(7). Plaintiffs contend that any form of provision of a milk marketing order that imposes financial obligations upon partially regulated plants for the sale within the regulated area of out-of-region milk constitutes a compensatory payment and that the Compact pooling scheme thus qualifies as such. In support of their argument, plaintiffs rely on the first and third sentences of § 7256(7):

> The Northeast Interstate Dairy Compact Commission shall not prohibit or in any way limit the marketing in the Compact region of any milk or milk product produced in any other production area in the United States.... The Compact Commission shall not use compensatory payments under section 10(6) of the Compact as a barrier to the entry of milk into the Compact region or for any other purpose.

*Id.* The Commission points to the fourth and final sentence of the subsection: "Establishment of a Compact over-order price, in itself, shall not be considered a compensatory pay-

ment or a limitation or prohibition of the marketing of milk." *Id.; see also In re Crowley Foods, Inc.,* Nos. HEP–97–001, –002, –004 & –005, at 15 ("The third and fourth sentences of the condition clearly must be read together. The express statement of the fourth sentence—that price regulation, in itself, shall not be considered a compensatory payment—strongly establishes that use of the remainder of the Compact's unconditioned regulatory provisions should not be construed as involving the use of 'compensatory payments.' ").

The Commission described a "compensatory payment pattern of regulation," as authorized by section 10(6) of the Compact, as follows:

> Such a pattern requires persons bringing milk into the regulated area to make a payment into the pool designed to "equalize" the cost for such milk against the cost paid by pool plants. As simply making an equalization payment, furthermore, such a person receives no credit from the pool for disbursement to supplying farmers. For example, such an equalization payment would have required petitioners on August 18 to make payment in some amount resembling $1.72 ($3.00–$1.28 (debit-credit paid by and to pool plants)). According to this regulatory pattern, furthermore, petitioners would have received no over-order credit for disbursement to producers.

*Id.* at 17.[10] The Commission argues that the fundamental difference between compensatory payments—provided for in section 10(6) and outlawed by Congress—and pooling—permitted by section 10(7) and not outlawed by Congress—turns on whether the proceeds of the monetary obligation are shared with farmers who supply the out-of-region plant (pooling) or whether the proceeds benefit only producers who supply the other, in-region plants (compensatory payments).

(Defs.' Reply Mem. Supp. Mot. Summ. J. at 13.)

Although it recognized that the distinction between the full pooling pattern of regulation authorized by Compact section 10(7) and the compensatory payment pattern authorized under section 10(6) "may be a subtle one," the Commission correctly pointed out that "it is no less vital for that subtlety" because Congress recognized the distinction in the Compact. *In re Crowley* at 17. The Commission persuasively reasoned that the "express inclusion of the one pricing mechanism of compensatory payments under § 10(6), along with another, distinct, mechanism of 'pricing and pooling of milk' immediately following under § 10(7), establishes that the Compact as originally conceived contained *two* separate means to regulate milk brought into the regulated area" from outside the area. *Id.* at 16.

Because Congress' conditional consent made explicit the nullification of the Commission's authority to promulgate compensatory payments under section 10(6) of the Compact but left intact the Commission's authority to promulgate provisions governing the pricing and pooling of partially regulated plants pursuant to section 10(7), I conclude that the Commission has demonstrated that the pooling scheme promulgated by the Commission pursuant to section 10(7) is not precluded by the Compact, Condition 7 of Congress' consent to the Compact, or the Commerce Clause.

E. *Administrative Assessments for Regular Costs*

▉ Plaintiffs also contend that, even if they are subject to the Commission's regulatory authority, aspects of the Commission's regulations conflict with provisions of the Compact. In particular, plaintiffs challenge the Commission's imposition of an additional

---

**10.** This description is consistent with the use of the term "compensatory payment" in the case law cited by the plaintiffs. *See, e.g., Lehigh Valley Co-op. Farmers, Inc. v. United States,* 370 U.S. 76, 82, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962) (discussing a plan requiring handlers who bring "outside" milk into the regulated area to make a compensatory payment to the pool producers); *Farmland Dairies v. McGuire,* 789 F.Supp. 1243,

1247–48 (S.D.N.Y.1992) (describing an equalization fund established under New York law requiring compensatory payments on non-New York Class I milk that benefitted only New York farmers). The Commission states that it derives its authority to regulate the plaintiffs from section 10(7) of the Compact and not from section 10(5)(A), which applies to equalization pools.

administrative assessment on handlers distributing Class I milk in New England regardless of the source of the milk they process, 7 C.F.R. § 1308.1 (1997).[11] They point to language in section 18(a) of the Compact, which provides: "In order to finance the costs of administration and enforcement of this compact, including payback of start-up costs, the commission is hereby empowered to collect an assessment from each handler who purchases milk from producers within the region." Compact, § 18(a). This initial assessment, if imposed, can be collected on a monthly basis for up to one year from the date the Commission convenes. *See id.* The Commission concedes that it has no authority to impose assessments for start-up costs on handlers who purchase milk from producers outside the region. However, it concluded that it is vested with the authority to impose administrative assessments on such handlers as part of an over-order regulation. Section 18(a) of the Compact states that, "[i]n addition, if regulations establishing an over-order price ... are adopted, they may include an assessment for the specific purpose of their administration." *Id.* Because the Commission's regulatory authority extends to all regulated handlers—including partially regulated plants—plaintiffs' argument is without merit.

▮ Plaintiffs claim that the assessment violates the equal protection clauses of the state and federal constitutions because it should also apply to Class II and III distributions (e.g., yogurt, cheese, butter). This is sour milk. As the Commission has no regulatory authority over non-Class I distributions, it is rational for the Commission to assess the costs of administering the over-order regulation—an assessment to which Congress consented—on all those who distribute Class I milk in the regulated area "as a cost of doing business in the market." *In re Crowley* at 25. Plaintiffs have not demonstrated that statutory discrimination among different classes of milk in calculating the assessments is not rationally related to the legitimate interest of administering the Compact. *See generally Friedman v. Rogers,* 440 U.S. 1, 17, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (quoting *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), for the "rationally related to a legitimate state interest" standard); *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 660 (1st Cir.1997) (describing rational basis review), *cert. denied,* —— U.S. ——, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998).

### F.  *Due Process*

Plaintiffs claim that New England producer and processor participation in the promulgation of an over-order price and in the "adjudicatory review" of that regulation violates the Due Process Clauses of the Fifth and Fourteenth Amendments because such individuals have a direct and substantial pecuniary interest in the milk pricing.[12]

---

11.  At oral argument, plaintiffs also bitterly complained that the pooling scheme unfairly affords pool plants an allocation preference and, in doing so, violates sections 10(5)(A) and/or 10(7) of the Compact. Reiterating the gist of their alleged injury, plaintiffs pointed out that, although both pool plants and partially regulated plants incur the same payment obligations into the pool (i.e., in proportion to their respective fluid milk distributions in the region), pool plants receive payments back for disbursements to producers based on the total volume of their milk receipts regardless of use, whereas partially regulated plants receive payments back only on their fluid milk distribution in New England. Plaintiffs claim that this scheme creates an unfair incentive for New York producers to supply milk to pool plants in order to maximize their returns from the pool. However, plaintiffs have not pressed an equal protection challenge to the scheme, although they make passing reference to such a claim in the Amended and Supplemental Complaint, (¶¶ 76–77). The primary argument

appears to be that this method of pooling is inconsistent with the approach that federal regulators have taken and hence is inconsistent with the provisions in the Compact authorizing equalization pools, Compact, § 10(5)(A). However, the Commission states that it is relying on section 10(7) and *not* on section 10(5), *see, e.g., In re Crowley* at 21 n. 28, and that its regulatory approach is logical because it has authority to regulate only Class I milk distribution into New England. It treated the issue only cursorily in its final decisions on plaintiffs' petitions. *See In re Elmhurst Dairy, Inc.,* Nos. HEP–97–007 & –008, at 9–11; *In re Crowley* at 16 n. 21, 20–21 & n. 28. This issue of why the allocation preference is inconsistent with section 10(5) and/or section 10(7) was raised in passim at oral argument and was inadequately briefed or explained in the record before me.

12.  The Commission argues that the challenge to its final decisionmaking process on the adminis-

Individuals from a particular industry typically serve on administrative bodies with regulatory authority over that industry. *See, e.g., Glickman v. Wileman Bros. & Elliott, Inc.,* 521 U.S. 457, 117 S.Ct. 2130, 2134, 2142, 138 L.Ed.2d 585 (1997) (upholding a statutory scheme in which advisory committees for the regulation of nectarines and peaches consisted of affected farmers); *Friedman,* 440 U.S. at 18, 99 S.Ct. 887 (upholding a state statute requiring that a majority of optometry board members be drawn from an organization of professional optometrists); *Stivers v. Pierce,* 71 F.3d 732, 743 (9th Cir.1995) ("[T]he system of industry representation on governing or licensing bodies is an accepted practice throughout the nation."); *Abramson v. Gonzalez,* 949 F.2d 1567, 1579 (11th Cir. 1992).

■■■ With regard to the Commission's adjudicatory capacity, it is well-settled that a fair proceeding before an impartial decisionmaker is a basic requirement of due process, applicable to administrative agencies as well as the courts. *See Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). "Among the cases in which the appearance of bias is 'too high to be constitutionally tolerable' are those in which the adjudicator has a direct and substantial pecuniary interest in the outcome of the case before him." *Stivers,* 71 F.3d at 742 (quoting *Withrow,* 421 U.S. at 47, 95 S.Ct. 1456). When an adjudicator has a direct, personal and substantial pecuniary interest, her participation constitutes a per se violation of due process. *See Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821–22, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). However, due process is not violated by the participation of adjudicators who "might conceivably have had a slight pecuniary interest" in the outcome of the case before them. *Id.* at 825, 106 S.Ct. 1580; *see also Tumey v. Ohio,* 273 U.S. 510, 518–19, 523, 535, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (finding a due process violation when, under a village ordinance establishing a "Mayor's Court" under the state's prohibition statute, the mayor was not compensated for hearing cases for violations of the statute unless they resulted in convictions).

■■■ Although there is a constitutional right to a fair and impartial hearing in an adjudicatory matter (i.e., a disciplinary hearing), there is no commensurate due process right to be regulated by an agency composed of members sympathetic to a particular economic interest. *See Friedman,* 440 U.S. at 18, 99 S.Ct. 887. "The Due Process Clause imposes only broad limits . . . on the exercise by a State of its authority to regulate its economic life," *id.* at 18 n. 19, 99 S.Ct. 887, and the " 'rigid requirements' . . . designed for officials performing judicial or quasi-judicial functions" are not applicable when the determinations affecting liability are not adjudicative, *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 618, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (quoting *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980)).

■■■ The agency proceedings here involve a challenge to the Commission's regulations on the grounds that they are contrary to the Compact and to the congressional consent legislation. The Commission represents diverse interests, not solely those of New England producers and processors. Pursuant to the terms of the Compact, the state delegations for each of the six participating states must include at least one "consumer representative" and one "dairy farmer." Compact, § 4. The inclusion of dairy farmers on the Commission reflects a deliberate judgment by the participating Compact states—a judgment approved by Congress—to account for dairy farmer expertise within each state delegation.

In light of the flexibility of the Due Process Clause, plaintiffs have not shown that the constituency of the state delegations that

---

trative petitions is procedurally defaulted because plaintiffs failed to present this claim to the Commission or to seek recusal of any Commission members. Although exhaustion is generally required, I conclude that this issue was fairly presented to the Commission. Although

plaintiffs did not separately challenge the final decisionmaking process on the administrative petitions, they did challenge the rulemaking proceedings. In these circumstances, the challenges conflate.

vote on over-order price regulations and on the legal petitions objecting to them unduly stretches the elastic reach of the Clause. *See Schweiker v. McClure,* 456 U.S. 188, 200, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) (rejecting the plaintiff's due process challenges "in light of the strong presumption in favor of the validity of congressional action and consistently with this Court's recognition of 'congressional solicitude for fair procedure'" (quoting *Califano v. Yamasaki,* 442 U.S. 682, 693, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979))).

### G. *Elmhurst*

■ Finally, plaintiff Elmhurst Dairy contends that the Commission has no regulatory authority to impose prices or regulatory assessments on it because it has no Class I distribution of milk in the regulated area. Instead, it sells packaged milk to an unaffiliated New York distributor that has some customers in New England. The Commission rejected this challenge, reasoning that "[t]he fact that the milk is sold in New England by a third party does not change the economic advantage that petitioner and the third party would gain if the regulation were not applied to those sales." *In re Elmhurst* at 9. In light of the skeletal briefing on this point, this issue appears particularly appropriate for *Chevron* deference because Congress has not directly addressed the question and the Commission's construction of the Compact and its purpose seems reasonable. *See Old Town Trolley Tours of Washington, Inc. v. Washington Metro. Area Transit Comm'n,* 129 F.3d 201, 204 (D.C.Cir. 1997) (affording judicial deference to decisions of interstate agencies).

### ORDER

Defendants' motion for summary judgment (Docket No. 43) is *ALLOWED.* Plaintiffs' motion for summary judgment (Docket No. 55) is *DENIED.* Defendants' motion to dismiss (Docket No. 34) is *DENIED.*