The ORGANIC COW, LLC, a Vermont
Corporation, Appellant,

v.

The NORTHEAST DAIRY COMPACT
COMMISSION, Respondent.

Nos. 2:98 CV 129, 2:97 CV 437.

United States District Court,
D. Vermont.

April 2, 1999.

Jane Osborne McKnight, Merritt &
Merritt, Burlington, VT, for The Organic
Cow, LLC, a Vermont Corporation, plain-
tiff.

Richard Thomas Cassidy, Hoff, Curtis,
Pacht, Cassidy & Frame, P.C., Burlington,
VT, for Northeast Dairy Compact Com-
mission, defendant.

## Opinion and Order

SESSIONS, District Judge.

Before the Court is an appeal pursuant to 7 CFR § 1381.5(a) by The Organic Cow, LLC ("The Organic Cow") from a final decision of the Northeast Dairy Compact Commission (the "Commission"). The Commission denied Organic Cow's petition for an exemption from the Northeast Dairy Compact's (the "Compact") "over-order" assessment obligation.[1] Also before the Court is the Commission's motion for summary judgment, urging affirmance of the Commission's decision. For the reasons set forth below the Commission's Final Decision is reversed and remanded. The Commission's motion for summary judgment is denied.

## I. Factual History

### A. *THE ORGANIC COW*

The Organic Cow, located in Tunbridge Vermont, is a company engaged in the handling, processing, marketing and sales of organic milk, organic butter, and organic cheese. The Organic Cow is a "handler" within the meaning of the Northeast Dairy Compact. It is also an organic dairy founded by Peter and Bunny Flint ("the Flints") who are owners and operators of a 400 acre organic dairy farm in Chelsea, Vermont. Peter Flint converted to organic farming in 1989.

The Organic Cow's producers use no pesticides, herbicides, fungicides, or commercial fertilizers. They use organically grown feed, which is often priced at twice the cost of conventional feed. These producers practice rotational grazing, requiring pasture changes twice a day. They do not use bovine growth hormones (rGBH or BST) on their cows, which results in lower production than the chemically enhanced cows some nonorganic farmers use in the production of conventional milk. The tran-

sition to organic dairy farming takes a minimum of three months and requires a large investment in organic grain. Farms are certified by organic farming agencies.

The Organic Cow was born out of the Flint's Tunbridge farm and rapidly expanded sales of organic milk all over New England and along the east coast. *Commission Final Decision,* HEP–97–006 ¶ 1 (*"Final Decision"*). The Organic Cow steadily increased its purchases of organic milk from organic dairy farmers located throughout New England and New York. *Id.* It is the dominant market outlet in New England for the production and sale of organic milk. *Id.* In 1997, the year on which the Commission's final decision is based, the Organic Cow was contractually committed by output contracts to pay its producers of certified organic milk $18.00 in Vermont, New York, and Massachusetts. *Id.* at ¶ 6. It must pay $18.25 per hundredweight to Maine producers of certified organic milk. *Id.* Premiums for quality and butterfat, which average $1.36 per hundredweight, and all transportation expenses, which can amount to an additional $1.20 per hundredweight of milk, are also paid by Organic Cow. Organic Cow's contracts are output contracts which require it to purchase all the milk produced pursuant to the producer's contracts, regardless of market conditions or consumer demand.

The Commission recognized that, as a result of the Flints' toil, organic farmers receive a "pronounced benefit." *Id.* at 6. The organic farmers who contracted with The Organic Cow "are being paid a premium price for the milk they produce. In addition, the Flints [through Organic Cow] almost single-handedly, helped to establish a market for the organic milk, *sustainably produced* by these supplying farmers from New England and New York." *Id.* (emphasis added).

---

1. For background on federal milk pricing regulations see, generally, *Zuber v. Allen,* 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); and for more specific background history regarding the Northeast Dairy Compact, *see, Milk Indus. Found. v. Glickman,* 132 F.3d 1467 (D.C.Cir.1998).

The producers which supply The Organic Cow are typically small family farms. *In Re Organic Cow, HEP–97–006,* Jan. 15, 1998 Hearing Tr. at 18–20 ("Record"). Testifying before the Commission, Peter Flint explained that approximately sixty farms produced and supplied organic milk to Organic Cow. *Id.* Of these sixty, approximately 45 are in Vermont, Maine and Massachusetts; the rest are in New York. *Id.* These producers average 150 acres per farm and approximately 40–45 cows. They are family farms, some of which "may have an employee." *Id.*

To determine the price paid to the small family farms which supply it organic milk, Organic Cow sought the help of the Vermont Department of Agriculture. Record at 25–26. After researching Organic Cow's plan, the Department of Agriculture recommended a price "between $17 and $19 per [cwt]." *Id.* Organic Cow chose to pay $18 per cwt. as "the middle ground." *Id.*

Organic Cow was in significant financial distress during the relevant July 1997 – December 1997 period when the Compact over-order price regulation was in effect. During that period, Organic Cow suffered substantial operating losses. H.P. Hood, Inc. has a 70% interest in Organic Cow, and despite the fact that under Organic Cow's Articles of Incorporation Hood was not liable for such debts, it loaned Organic Cow more than one million dollars during this period to cover on-going operating expenses.

## B. *GOT MILK?*

As put forth in the Compact's statement of purpose:

> The mission of the commission is to take such steps as are necessary to assure the continued viability of dairy farming in the northeast, and to assure consumers of an adequate, local supply of pure and wholesome milk.... Dairy farms, and associated suppliers, marketers,

processors and retailers, are an integral component of the region's economy. Their ability to provide a stable, local supply of pure, wholesome milk is a matter of great importance to the health and welfare of the region .... the participating states affirm that their ability to regulate the price which northeast dairy farmers receive for their product is essential to the public interest. *Assurance of a fair and equitable price for dairy farmers ensures their ability to provide milk to the market and the vitality of the northeast dairy industry, with all the associated benefits.*

S.J. Res. 28, 104th Cong., art. 1 § 1 (emphasis added).[2] As the Compact states, the benefits flow directly from a "fair and equitable" price paid to dairy farmers. The Compact is to be construed liberally in order to achieve the purposes and intent enunciated in section one. *Id.* Art. II § (3)(b).

In order to perform its stated purpose, the Commission has authority to adopt an over-order price regulation ("over-order regulation" or "over-order price"). The over-order price is a minimum price producers are required to be paid for milk. The over-order price is established by the Commission and is above the price established in federal marketing orders or by state farm price regulation in the regulated area. In determining the over-order price, the Commission must look at

> ... the costs of production including, but not limited to the price of feed, the cost of labor including the reasonable value of the producer's own labor and management, machinery expense, ... and the price necessary to yield a reasonable return to the producer and distributor.

*Id.* at Art. IV § 9(e). Over-order pricing is then set by the Commission in accordance with regulations set forth in 7 C.F.R. §§ 1300.1–1305.1 and 1306.3.

---

**2.** The text of the Compact was not classified to the U.S.Code.

An over-order assessment obligation is then computed monthly from the difference between the over-order price and the federal price for milk. 7 C.F.R. § 1305.1. Processors multiply their total fluid milk sales by the difference between the two amounts and pay that sum to the Commission, which in turn redistributes the proceeds of the payments to the handlers for disbursement to the farmers. The effect is to achieve an increased and stabilized price for milk in the region.

The Commission adopted the over-order regulation effective July 1, 1997. As of July 1, 1998, the over-order price was $16.94 per hundredweight of milk disposed in the New England Compact region. The Commission does not currently recognize any difference in economics and market conditions between conventionally and organically produced milk. Conventional and organic "handlers" alike must pay a "one size fits all" over-order assessment. Therefore the monthly assessment to the Commission required by the over-order price regulation is the same for a handler which pays $14.00 per hundredweight and Organic Cow, which pays over $20.00 per hundredweight. The Commission thus requires Organic Cow to pay an over-order assessment in addition to the premium price it already pays its organic producers.

## C. THE BEEF BETWEEN ORGANIC COW AND THE COMMISSION

As of July 1, 1998, Organic Cow had been charged by the Commission with a start up assessment of $749.99, administrative assessments of $2,924.11 and a total unpaid over-order price obligation of $149,033.92.

The Organic Cow alleges that in order to develop a network of organic producers in New England, it was required to guarantee an outlet for organic milk. Farmers, according to the Organic Cow, would not make the transition to organic dairy production without a guaranteed outlet. The Organic Cow further alleges that it must pay its producers substantially in excess of the $16.94 over-order price established by the Commission due to the economics of organic dairy farming.

The Organic Cow also argues that the Commission's insistence on applying the conventional milk over-order obligation to organic milk is irrational. The Commission does not recognize any difference, in either market conditions or economics, between organic and conventional milk handlers relative to the over-order price regulation. As a result, Organic Cow claims that the over-order price assessments threaten its financial viability; and if it ceases to function, many of its organic producers, i.e., small family farms, will lose an outlet which offers sustainable prices for organic milk, cease farming or suffer other unreasonable hardships in direct contravention of the mission of the Compact. Further, the Commission, in the view of Organic Cow, has abrogated its duty to consider, *inter alia,* "the costs of production, ... feed, labor ... and the price necessary to yield a reasonable return to the producer and distributor" as required of the Commission by the Compact.

The Commission does not contend Organic Cow's contracts fail to give farmers a sustainable price for organic milk; rather the Commission's position is that "[i]t is reasonable to infer that some or all of the producer suppliers would renegotiate [their contracts] rather than lose [their] business relationship with the Organic Cow." *Final Decision,* ¶ 14. The Commission's position requires organic farmers and the Organic Cow to adjust their pricing to comport with the Commission's assessment criteria rather than adjust its criteria to account for the unique situation faced by organic farmers and this particular handler. Essentially, the Commission argues it is reasonable to uniformly require all distributors of Class I milk to pay the over-order obligations it imposes regardless of their financial condition or how much these distributors pay to their farmers.

## III. Procedural History

On August 17, 1997, Organic Cow filed with the Commission a petition for exemption from the over-order price regulation. The Commission, by order dated August 28, 1997, required Organic Cow to make assessment payments into escrow pending the outcome of that proceeding. Organic Cow failed to make the assessment payments into escrow, and the Commission filed suit against Organic Cow in federal court on December 31, 1997.

On January 15, 1998 the Commission heard testimony and took evidence in the matter of *In re petition of The Organic Cow*, HEP–97–0006 (the "Petition"). Organic Cow argued three grounds in support of its assertion that an exemption from the over-order price regulation should be granted: 1) the regulation works an unconscionable hardship on Organic Cow, which does not further the purposes of the Compact; 2) the over-order price regulation constitutes an unconstitutional impairment of contract; and 3) the over-order price regulation is arbitrary and unlawfully discriminates against Organic Cow. Final Decision at 4. The Commission denied the Petition on March 31, 1998. Organic Cow filed the instant appeal on April 22, 1998. The Commission's enforcement action and the Organic Cow's appeal were consolidated on April 24, 1998.

The Organic Cow's appeal challenged the Compact's over-order price regulation as an unconstitutional impairment of contract, as a violation of due process and equal protection, and, as applied to organic milk, a direct contravention of the Compact itself (paper 1).

## III. Discussion

### A. *STANDARD OF REVIEW*

The Compact and the Code of Federal Regulations which governs the Commission's procedures are silent on the appropriate standard of review for an appeal from a ruling of the Commission. *See, generally,* 7 U.S.C. § 7256(1)–(7); and 7 C.F.R. § 1381.5 (1998). Accordingly, the Court will be guided by the standard of review set forth in the Administrative Procedures Act. 5 U.S.C. § 706(2), which provides in relevant part that a reviewing court shall:

> hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case ... reviewed on the record of any agency hearing provided by statute ...

*See Old Town Trolley Tours of Wash., Inc. v. Washington Metro. Area Transit Comm'n*, 129 F.3d 201, 204 (D.C.Cir.1997) (where Code of Federal Regulations is silent on standard of review of interstate authority, Court adopts 5 U.S.C § 706(2)(A)–(D)); *see also, Supreme Oil Co. v. Metropolitan Transp. Auth.*, 157 F.3d 148, 151 (2d Cir.1998) (per curiam) (agency's decision reversed only where " 'arbitrary, capricious, an abuse of discretion, ... otherwise not in accordance with the law' or 'unsupported by substantial evidence.' "); *Fund for Animals v. Babbitt*, 89 F.3d 128, 132 (2d Cir.1996) (same).[3]

---

**3.** The Commission relies upon *People ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1308, 1313–14 (9th Cir.1985), to support its argument that it is "entitled to substantial deference" in its decision making and fact finding and "substantial interpretive latitude" in its application of the Compact. *Tahoe Reg'l Planning Agency* is, however, of little assistance as it merely states the rule that a court shall not "supplant reasonable agency regulations with its own" in reviewing an agency's interpretation of legislation and

In determining whether the Commission's actions were "arbitrary" or "not in accordance with law," the court's duty is to determine whether

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'

*Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

The Commission will be reversed if the record demonstrates an absence of substantial evidence to support its decision. *Supreme Oil Co.,* 157 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *United States v. Int'l Bhd. of Teamsters,* 964 F.2d 1308, 1311–12 (2d Cir.1992); *Williams v. Bowen,* 859 F.2d at 258 (same). "Although narrow, appellate review of an administrative record must nonetheless be careful, thorough and probing." *Ward v. Brown,* 22 F.3d 516, 521 (2d Cir.1994).

A decision or ruling by the Commission not in accordance with law or supported by substantial evidence must be remanded to the Commission either "(1) to make such

implementation of regulations. *Id.* at 1313. Here, the Court is asked to review the Commission's fact-finding, not its regulatory promulgations as was the situation in *Tahoe Reg'l Planning Agency.* Further, the statute in *Tahoe Reg'l Planning Agency* already incorporated a specific standard of review to which the Court was bound. *Id.*

4. Organic Cow has argued that the regulation violates the Contract Clause. U.S. Const. art

rulings as the Court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires." Compact, art. VI § 16(c).

## B. *IMPAIRMENT OF CONTRACT*

■ Organic Cow argues that the over-order price regulation constitutes an unconstitutional impairment of contract.[4]

To prevail on a claim that federal economic legislation unconstitutionally impairs a private contractual right, the party complaining of unconstitutionality has the burden of demonstrating, first, that the statute alters contractual rights or obligations.

*National R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry.,* 470 U.S. 451, 472, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). The first question is thus: does the over-order price regulation alter contractual rights or obligations between Organic Cow and its producers? The answer is no. Granting that all Organic Cow argues is true: that its long-term, fixed price supply contracts with its producers are set at prices that far exceed the price set by the Commission, that the regulation in effect forces Organic Cow to subsidize the operation of conventional milk producers, and that enforcing the over-order price regulation against Organic Cow will have a ruinous effect on its business and on the organic milk industry, the regulation simply does not alter any contractual rights or duties between Organic Cow and its producers. Nothing in the regulation impairs Organic Cow's freedom to honor its contracts as written, and the producers remain free to require it to do so.

1, § 10, cl. 1. Because the Compact is a product of federal, not state legislation, the Contract Clause, which prohibits *states* from enacting laws impairing the obligation of contracts, is not applicable. See *Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1507 (D.C.Cir.1984) (constraints of Contract Clause not applicable to review of congressional legislation).

## C. DUE PROCESS and EQUAL PROTECTIONS[5]

■ In connection with a challenge to federal economic legislation, "the party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality and 'establish that the legislature has acted in an arbitrary and irrational way.'" *National R.R. Passenger*, 470 U.S. at 472, 105 S.Ct. 1441 (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)). If the law is "seen to have a reasonable relation to a proper legislative purpose, and [is] neither arbitrary nor discriminatory, the requirements of due process are satisfied." *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 78 L.Ed. 940 (1934). The Supreme Court has consistently "defer[red] to Congress's economic policy prerogatives." *LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 486–87 (2d Cir.1995) (minimum scrutiny applied to economic regulation; due process merely requires that regulation be supported by legitimate legislative purpose furthered by rational means) (quoting *Pension Benefit Guar. Corp.*, 467 U.S. at 729, 104 S.Ct. 2709).

Organic Cow argues that the over-order price regulation discriminates against handlers of fluid milk as opposed to manufactured milk, discriminates against handlers who dispose of fluid milk within New England as opposed to those who distribute outside the region, and recognizes no distinction between the organic and the conventional milk economies.

The over-order price established pursuant to the Compact was expressly intended to apply strictly to fluid (Class I) milk. Compact, § 9(b). The Congressional intent, as set forth in the Compact, was to ensure a "stable, local supply of pure, wholesome milk," from "[d]airy farms, and associated suppliers, marketer, processors and retailers, [as] an integral component of the region's economy." *Id.*, § 1. Organic Cow has not quarreled with the Congressional intent; accordingly all this Court must determine is whether the means chosen to achieve this purpose are arbitrary or irrational. *In re Chateaugay Corp.*, 53 F.3d at 487.

To protect this vital economic interest and all the "associated benefits" which it found flowing from the dairy industry, Congress permitted the Commission to assess an over-order price, as part of a "a *flexible mechanism* able to adjust to changes in a regulated marketplace," to apply "throughout the region or in any part or parts thereof." *Id.*, § 2 (emphasis added). Maintaining a region's economy by guaranteeing a minimum price to farmers by virtue of an over-order obligation is a rational means to achieve this purpose. The fact that the over-order regulation does not reach the handlers of manufactured milk, or those who distribute fluid milk outside the New England region, does not render the regulation unconstitutional. "If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality." *Castellano v. Board of Trustees of the Police Officers' Variable Supplements Fund*, 937 F.2d 752, 755 (2d Cir. 1991) (quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)).

As to its refusal to recognize a distinction between the organic and conventional milk markets, the Commission concluded that price premiums, regardless of their nature, "provide[d] important price signals in the marketplace that affect the volume of milk produced and consumed" and that it would not "interfere with those signals."

5. Although the Fifth Amendment contains no equal protection clause, it "forbids discrimination that is 'so unjustifiable as to be violative of due process.'" *Schneider v. Rusk*, 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964) (quoting *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954)).

Final Decision at 11. At issue is whether this refusal to make a distinction between these markets and these handlers is rationally related to the purposes of the Compact.

Although the constitutionality of a statute or regulation may be challenged by evidence that the provision as applied is irrational, *United States v. Carolene Products Co.,* 304 U.S. 144, 153–54, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), if it is evident from the record that the question is at least debatable, the challengers cannot prevail. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).

There is substantial evidence in the record before the Commission to support a conclusion that failure to make a distinction between the organic market and the conventional market with regard to the application of the over-order price regula-

tion is irrational, and inconsistent with the purposes of the Compact, to "assure the continued viability of dairy farming in the northeast." Compact, § 1, 3(b). Specifically, this Court notes the evidence that (1) Organic Cow is a handler of a distinct and unique niche product within the Class I fluid milk market; (2) as a niche market product, the producer/farmers' and Organic Cow's operating economics are distinct from the economics of conventional milk; (3) retailers, in their pricing [6] and shelving of organic milk, treat Organic Cow's milk as a distinct product within the Class I milk market; (4) Organic Cow's producer contracts advance the purposes of the Compact by giving farmers a sustainable fixed price for their product; and (5) approximately sixty small family farms which currently depend on Organic Cow to maintain their farms will be harmed if Organic Cow is forced to cease operations.[7]

6. The evidence presented to the Commission showed that Organic milk, such as that produced by the Organic Cow, is typically priced at twice the price of conventional milk.

7. See Affidavit of Ann Stinson:
... the unweighted average price paid to us during 1997 was $13.72. However, the real price was much lower, since we were required to pay the cost of transporting the milk to Gorelick, which usually averaged between $400.00 and $600.00 per moth. We were unable to achieve a subsistence income selling our milk on the conventional market. We were, virtually at all times, unable to pay all our bills. The prices we received fluctuated significantly and were simply insufficient to allow us to pay the bills associated with running the farm. By last year, I was completely in despair over our inability to break even in our dairy operations. I was without hope and increasingly worried about my husband, who found it more and more difficult to continue working at this profession. For example, we are at presently in arrears on our property taxes, repair work, fuel bills, and supplies for our milk room. We have been unable to save for our retirement. One reason that we survived this long is that I was able to teach piano and voice from our home and bring in the cash we needed to put food on the table and gas in the car. In August 1997, we received our certification from the Maine Organic Farmers and Gar-

deners Association, and began selling to the Organic Cow at about that time. We signed a written contract guaranteeing Stinson Farms, Inc. a minimum of $18.25 per cwt for a two-year term. In addition, we qualify for the standard premiums for quality and butterfat offered by the Organic Cow.
... If we were unable for any reason to sell our milk to The Organic Cow, we have decided to shut down our dairy farm. We will be out of business. We will not receive enough cash from the liquidation of our herd to allow us to hold on to our home and acreage, which has a mortgage against it. Our plan is to sell the farm. We know from our many years of experience that if we return to conventional farming, we will be unable to pay the bills, even if we receive the over-order price (currently $1.50) mandated by this New England Dairy Compact Commission. It makes no sense for us to continue to work that hard while our debts only grow larger and we achieve nothing. For the first time in our lives as dairy farmers, my husband and I have hope for the future that we may be able to make it as dairy farmers until our retirement. We are still in debt, but hope to retire that debt as we continue to do business with The Organic Cow.
See also Aff. of Linda Hartkopf, dated Sept. 12, 1997; Aff. of Robie Leavitt, dated Sept. 15, 1997.

Nevertheless, in the face of the Commission's determination to "leave market forces undisturbed" as far as possible, this Court must conclude that, for purposes of a substantive due process challenge to an economic regulation, Organic Cow has succeeded in demonstrating only that the issue is fairly debatable. Its constitutional challenge to the over-order price regulation as applied to organic milk handlers must therefore fail. *Clover Leaf Creamery*, 449 U.S. at 464, 101 S.Ct. 715.

## D. *VIOLATION OF THE COMPACT*

■ Finally, Organic Cow has challenged the application of the over-order price regulation when applied to handlers of organic milk as violative of the Compact itself and its purposes. As discussed above, the record before the Commission was replete with evidence that to apply an over-order price regulation designed for the conventional milk market to organic milk handlers threatened rather than promoted the purposes of the Compact, to "take such steps as are necessary to assure the continued viability of dairy farming in the northeast," and to "[assure] ... a fair and equitable price for dairy farmers." Compact, art. I § 1.

The Commission's Findings of Fact ignored this evidence. The Findings state simply that "[o]rganically-produced fluid milk and milk products are not differentiated from non-organic fluid milk and milk products under the federal Milk Market Order system of federal milk prices," Final Decision, ¶ 8; and "... all Class I fluid milk, organic and non-organic, distributed in New England is regulated uniformly under the Northeast Interstate Dairy Compact and the Compact over-order price regulation." Final Decision, ¶ 9. The Commission's Conclusions of Law are equally bald:

The Compact over-order price regulation was adopted only to establish a new, flat, Class I benchmark price for all milk marketed in New England, effective July 1, 1997. It is otherwise intended to be neutral in its effect on all other market forces that influence the supply of and demand for Class I milk in the New England market. In order to leave these market forces undisturbed to the degree possible, the regulation does not recognize or give credit for the nature or amount of price premiums paid by any processor, whether for organic or non-organic milk. Premiums, including those paid by the petitioner, provide important price signals in the marketplace that affect the volume of milk produced and consumed and the Commission intends not to interfere with those signals.

Final Decision at 11.

This Court is not empowered to substitute its judgment for that of the Commission. But this Court is unable to judge from the casual and conclusory remarks in the Commission's Final Decision whether the Commission considered Organic Cow's argument that organic milk producers and handlers should be treated differently than non-organic producers and handlers under the Compact; and if it did consider the argument, on what basis it rejected it. Accordingly, this Court is unable to conclude that the Commission's decision on this point is supported by substantial evidence. *International Bhd. of Teamsters*, 964 F.2d at 1311–12; *Williams v. Bowen*, 859 F.2d at 258.[8]

It is an axiom of administrative law that an agency's explanation of the basis for its decision must include a rational connection between the facts found and the choice made. Agency deference has not come so far that [courts] will uphold regulations whenever it is possible to conceive a basis for administrative ac-

---

8. *See, Milk Industry Foundation v. Glickman*, 949 F.Supp. 882, 894 (D.D.C.1996) (finding that Secretary of Agriculture's terse and unsupported statements regarding the implementation of the Northeast Dairy Compact rendered Secretary's decision arbitrary and capricious) (citing *International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C.Cir.1983)).

tion. To the contrary, *the presumption of regularity afforded an agency in fulfilling its statutory mandate is not equivalent to the minimum rationality a statute must bear in order to withstand analysis under the Due Process Clause.* Thus, the mere fact that there is some rational basis within the knowledge and experience of the [Commission] ... under which they 'might have concluded' that the regulation was necessary to discharge their statutorily authorized mission, will not suffice to validate agency decisionmaking.... [The] recognition of Congress' need to vest administrative agencies with ample power to assist in the difficult task of governing a vast and complex industrial Nation carries with it the correlative responsibility of the agency to explain the rationale and factual basis for its decision, even though [courts] show respect for the agency's judgment in both.

*Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–7, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (citations and internal quotations omitted) (emphasis added). Accordingly, this Court will not attempt to "supply a reasoned basis for the [Commission's] action that the [Commission] itself has not given." *Motor Vehicle Mfrs. Assoc.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

The Commission is charged with establishing regulations which

consider the balance between production and consumption of milk and milk products in the regulated area, the costs of production including, but not limited to the price of feed, the cost of labor including the reasonable value of the producers's own labor and management, machinery expense, and interest expense, the prevailing price for milk outside the regulated area, the purchasing power of the public and the price necessary to yield a reasonable return to the producer and distributor

Compact, art. 4, § 9(e). In considering the above factors necessary to achieve the purpose of, *inter alia,* "a fair and equitable price for dairy farmers" the Commission is given additional authority, apart from setting over-order pricing, to make "additional rules and regulations as it deems necessary ... *to effectuate in any other respect the purposes of this compact.*" *Id.*, art. III, § 7 (emphasis supplied).

The purpose for which the Compact was established is laudatory and the Commission's job is to follow the Compact's mandate. The Commission unambiguously acknowledged the "pronounced benefit" organic dairy farmers receive as a result of their contracts with Organic Cow. *Final Decision* at 6. Organic farming now plays a vital and increasingly significant role in the agriculture industry within this region of the country. Its benefits extend to all of us who enjoy the privilege of living here. The impact upon organic farming from the Commission's decision to fail to differentiate it from non-organic farming in setting over-order pricing may be dramatic. It would indeed by ironic that a decision made by the Commission threatened the viability of a guaranteed market for milk at a fair and equitable price for organic farmers for the sole and exclusive purpose of maintaining uniformity.

The Commission must do more than merely recite its conclusion that the Organic Cow is obligated to pay the over-order obligation and ask this Court to defer to its "inference." Rather, the Commission must produce findings based on the evidence and draw conclusions from those findings which permit a reviewing court to discern the rationale for the decision. *See, e.g., Shoreham Coop. Apple Producers v. Donovan*, 764 F.2d 135, 140 (2d Cir.1985) (agency obligated to examine available evidence and to articulate rational connection between the evidence and its exercise of discretion).

Based on the Commission's Final Decision and the administrative record of the proceedings before it, the Court concludes that the Commission's summary rejection

of Organic Cow's argument, that it should receive an exemption because the like treatment of organic and non-organic milk handlers is arbitrary and not in accordance with law, is unsupported by substantial evidence.

## IV. Conclusion

For the reasons stated above, the Final Decision of the Commission is RE-VERSED and the matter is REMANDED to the Commission for further proceedings consistent with this Opinion.

The Commission's motion for summary judgment is DENIED without prejudice and may be refiled after the Commission has completed the hearings on The Organic Cow's petition.