THE ORGANIC COW, LLC, Appellant,

v.

The NORTHEAST DAIRY COMPACT COMMISSION, Appellee.

No. 2:00–CV–267.

United States District Court, D. Vermont.

Sept. 24, 2001.

Jane Osborne McKnight, D'Amico & McKnight, PLC, Burlington, VT, for appellant.

Richard Thomas Cassidy, Hoff, Curtis, Pacht, Cassidy & Frame P.C., Burlington, VT, Daniel J. Smith, Northeast Dairy Compact, Executive Director and General Counsel, Montpelier, VT, for appellee.

## OPINION AND ORDER

SESSIONS, District Judge.

Before the Court is an appeal pursuant to 7 C.F.R. § 1381.5(a) by The Organic Cow, LLC ("Organic Cow") from a final decision of the Northeast Dairy Compact Commission ("Commission") denying Organic Cow's petition for an exemption from the Commission's over-order price obligation. On a previous appeal taken by Organic Cow from the Commission's decision to deny the exemption, the Court reversed and remanded for further proceedings. *See Organic Cow, LLC v. Northeast Dairy Compact Comm'n*, 46 F.Supp.2d 298 (D.Vt.1999). For the reasons stated below, the second final decision of the Commission is affirmed.

## I. *Factual Background*

■ Minimum milk prices nationwide are set by the Secretary of Agriculture, under the authority of the Agricultural Marketing Agreement Act of 1937. The states retain authority to establish milk prices above the federal price floor. *See Milk Indus. Found. v. Glickman*, 132 F.3d 1467, 1471 (D.C.Cir.1998). In 1993, the six New England states agreed to form the Northeast Interstate Dairy Compact ("Compact") in order to raise the minimum fluid milk prices that northeast dairy farmers receive. Congress consented to the Compact on April 4, 1996, based upon a finding by the Secretary of Agriculture of a compelling public interest. *See* 7 U.S.C.A. § 7256 (West 1999 & Supp.2001).

The Compact's mission is

to take such steps as are necessary to assure the continued viability of dairy farming in the northeast, and to assure consumers of an adequate, local supply of pure and wholesome milk.... Dairy farms, and associated suppliers, marketers, processors and retailers, are an integral component of the region's economy. Their ability to provide a stable, local supply of pure, wholesome milk is a matter of great importance to the health and welfare of the region.... [T]he participating states affirm that their ability to regulate the price which northeast dairy farmers receive for their product is essential to the public interest. Assurance of a fair and equitable price for dairy farmers ensures their ability to provide milk to the market and the vitality of the northeast dairy industry, with all the associated benefits.

Compact, Art. I, § 1, S.J.Res. 28, 104th Cong., 1st Sess. (1995).

The Compact's rules of construction state that it shall be

construed liberally in order to achieve [its] purposes and intent ... It is the intent of this compact to establish a basic structure by which the commission may achieve those purposes through the application, adaptation and development of the regulatory techniques historically associated with milk marketing and to afford the commission broad flexibility to devise regulatory mechanisms to achieve the purposes of this compact.

*Id.*, Art. II, § 3.

The Commission's over-order price sets a minimum price for Class I milk.[1] In

determining the price, the Commission must consider

the balance between production and consumption of milk and milk products in the regulated area, the costs of production including, but not limited to the price of feed, the cost of labor including the reasonable value of the producer's own labor and management, machinery expense, and interest expense, the prevailing price for milk outside the regulated area, the purchasing power of the public and the price necessary to yield a reasonable return to the producer and distributor.

*Id.*, Art. IV, § 9(e). The Commission established $16.94 per hundredweight ("cwt")[2] as the Compact over-order price for Class I milk. *See* 7 C.F.R. § 1305.1 (2001). Milk processors must pay into the Commission pool a monthly over-order obligation, the difference between $16.94 and the price established by federal regulation each month, multiplied by their total volume of fluid milk distributed in New England.[3] *See N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n,* 26 F.Supp.2d 249, 257 (D.Mass.1998), *aff'd,* 198 F.3d 1 (1st Cir.1999), *cert. denied,* 529 U.S. 1098, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2001). The Commission disburses most of these funds to the processors, who pay the dairy farmers based on their production. All farmers producing milk in the region share in the disbursement.

Organic Cow is a Vermont organic dairy founded in the early 1990's, incorporated in 1993, and reorganized in 1997 as a Vermont limited liability company. At that point, Organic Cow's original founders, Pe-

---

1. "Class I milk" means milk disposed of in fluid form or as a fluid milk product. Compact, Art. II, § 2.

2. A hundredweight of milk equals approximately 8.3 gallons. *See N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact*

*Comm'n,* 198 F.3d 1, 5 n. 4 (1st Cir.1999), *cert. denied,* 529 U.S. 1098, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000).

3. If the federal price exceeds the Compact price, the over-order obligation is zero.

ter and Bunny Flint, sold a 70% interest in Organic Cow to H.P. Hood & Co., Inc. ("Hood"), a large Massachusetts dairy marketer and distributor. In April 1999 Organic Cow sold its trademark and certain contract rights to Horizon Organic Holding Corporation ("Horizon"), a leading producer of organic milk and other dairy products.

Organic Cow's principal product is organic fluid milk. In 1994, Organic Cow began contracting with other organic dairy farmers in Vermont to buy their milk. At the commencement of this exemption proceeding, in 1997, Organic Cow had contracted with some sixty producers, forty-five of which were located in the Northeast Dairy Compact region, in Vermont, Massachusetts and Maine.

The contracts were "output" contracts, meaning that Organic Cow was required to purchase all conforming milk produced regardless of market conditions. The contracts provided for a minimum price of $18.00 per cwt, plus additional compensation for quality and butterfat content. The average price being paid by Organic Cow under those contracts was $19.36 per cwt.[4] The contracts were for a standard term of two years and provided for automatic renewal unless a party opted out of a contract extension by written notice.

In August 1997, Organic Cow was disposing of more than 1,000,000 pounds (10,380 cwt) per month of organic fluid milk within the Compact region. By contract it was paying its producers substantially more for their milk than the Compact's over-order price. As a "handler" within the meaning of the Compact,[5] however, it was subject to the Compact's over-order

price obligation, regardless of the contract price it paid its producers.

Organic Cow's producers typically operate small farms, averaging 150 acres and forty to forty-five cows. Approximately 7,500 acres of organic farmland is involved. Certified organic dairying methods require that no pesticides, herbicides, fungicides, or commercial fertilizers be used. Organic dairy farmers use organic hay and feed, and practice rotational pasture management. Organic crop production is more time-consuming and more expensive than conventional crop production, and organic feed can cost three times as much as conventional feed. The average feed cost for organic dairy farmers is approximately 140 to 150% of that of conventional dairies. In addition, organic dairy farmers use no bovine growth hormones, rely on homeopathic remedies rather than antibiotics except for emergencies, and experience higher labor costs than most conventional dairy farmers.

To convert from conventional to organic dairy farming requires a substantial investment by the farmer. The high cost of production is reflected in the higher contract price Organic Cow has determined to be sustainable for organic dairy farmers. The higher cost in turn is passed on to consumers: organic fluid milk retails for as much as $2.99 per half gallon. In 1998 organic milk represented .4% of overall fluid milk sales in New England.

Organic Cow was a handler of milk within the meaning of the Compact from 1997 until June 30, 1998, when it ceased operation of its milk handling plant in Tunbridge, Vermont. Beginning in July 1998, Hood began to process all Organic Cow milk. At that point the Commission deter-

---

**4.** Effective January 1, 1999, the price was increased to $21.00 ($21.25 in Maine), plus premiums, for an average payment in excess of $24.00.

**5.** *See* 7 C.F.R. § 1301.9 (2001).

mined that Hood became the handler of Organic Cow milk, and Hood took over payment of the over-order obligation and administrative assessments for Organic Cow milk.

## II. *Procedural Background*

On August 18, 1997, Organic Cow filed a petition seeking exemption from the Commission's over-order price regulation. Organic Cow sought and was granted permission to pay its assessments into escrow, pending the outcome of the administrative proceeding. A three member hearing panel conducted an evidentiary hearing on Organic Cow's petition on January 15, 1998. Organic Cow argued that (1) the regulation worked an unconscionable hardship on Organic Cow, which does not further the purposes of the Compact; (2) the over-order price regulation constituted an unconstitutional impairment of contract, and (3) the regulation violated Organic Cow's constitutional rights to substantive due process and equal protection. On March 31, 1998 the Commission issued a Final Decision denying the petition.

Organic Cow timely appealed the Commission's decision. Organic Cow argued on appeal that the over-order price regulation was an unconstitutional impairment of contract, a violation of due process and equal protection, and, as applied to organic milk, contrary to the purposes of the Compact. The appeal was consolidated with the Commission's enforcement action against Organic Cow for failure to pay its over-order and administrative assessments, filed December 31, 1997.[6] *See Organic Cow, LLC v. Northeast Dairy Compact Comm'n*, 46 F.Supp.2d 298 (D.Vt. 1999) (oral consolidation order). This Court rejected the constitutional claims, but held that the Commission's decision to apply the over-order price regulation to handlers of organic milk was unsupported by substantial evidence. *See Organic Cow*, 46 F.Supp.2d at 307–08. The matter was remanded to the Commission for further proceedings consistent with the opinion.

On remand, the hearing panel directed OC to file a brief addressing any pertinent legal issues raised by the opinion, including the issue of like treatment of organic and non-organic milk handlers under the Commission's price regulation. Up to two affidavits could be submitted along with the brief, to address any facts or circumstances relating to Organic Cow's claim for exemption that had arisen since the evidentiary hearing on January 15, 1998. The Commission was allowed the same in response, and OC was allowed a reply. The hearing panel limited the taking of evidence to affidavits, and did not conduct an oral hearing. *See* 7 C.F.R. § 1381.4(b); (c) (2001). Organic Cow did not object to this procedure.

In its opening brief, Organic Cow argued from the administrative record of the case as it existed on January 15, 1998. It also submitted two affidavits, one from Peter Flint, president of Organic Cow, and one from Mark Retzloff, a co-founder of Horizon. The Flint affidavit attested to an increase in the base price Organic Cow

---

**6.** Organic Cow failed to make its escrow payments, and the Commission filed suit against Organic Cow to collect the amounts owed. *See Northeast Dairy Compact Comm'n v. Organic Cow, LLC*, No. 97–cv–437 (D.Vt filed Dec. 31, 1997). Organic Cow was ordered to commence escrow payments as of March 1998, but was granted a stay of payment of the past due amount. *See id.* (D.Vt. Mar. 9, 1998) (order granting preliminary injunction). In September 1998, the Commission ceased escrowing the payments, by then being made by Hood, contending that Organic Cow was no longer a handler. Organic Cow objected, but took no further action.

paid its producers, and its efforts through December 1998 to obtain a separate over-order price regulation for organic milk through a rule-making petition before the Commission. The Retzloff affidavit attested to the cost differential between conventional and organic milk, presented a study regarding price elasticity of organic milk, and addressed the equities of requiring organic milk handlers to pay the over-order price assessment.

The Commission's opening brief discussed Organic Cow's particular circumstances, and the Commission's actions in general regarding organic milk. Two affidavits were submitted in support of the Commission's brief, one from Kenneth Becker, then executive director of the Commission, and one from Carmen Ross, the regulations administrator of the Commission. The Ross affidavit presented the calculations of the monthly assessments and payments due from and to Organic Cow. The Becker affidavit detailed the Commission's actions with regard to the issue of separate treatment for organic milk under the Compact. These included: (1) discussion of an exemption for organic milk handlers during the initial rulemaking proceeding to adopt an over-order price regulation; (2) a costs of production study in which organic milk producers were surveyed, but responded in insufficient numbers to be included in the study; (3) a fact-finding inquiry into organic milk production, processing and distribution in response to Organic Cow's petition to initiate rulemaking; and (4) a subjects and issues rulemaking proceeding on whether to exempt organic milk handlers from the over-order obligation. The Becker affidavit focused on the Commission's actions with regard to the regulation of organic milk following its first decision on Organic Cow's petition for exemption on March 31, 1998.

Organic Cow objected to the inclusion of material not part of the original record in the administrative proceeding, and requested that the Ross and Becker affidavits be excluded from the record. The hearing officer denied Organic Cow's request, but granted it an opportunity to submit additional comments in response to the Commission's affidavits. By way of response Organic Cow renewed its request to exclude the affidavits, and objected that it had not been afforded sufficient time to respond substantively to the materials.

The Commission denied Organic Cow's petition for exemption on June 7, 2000. The decision emphasized the Commission's attention to the issues of exemption or separate treatment for organic milk producers, and decided that differential treatment of organic milk was not warranted. It concluded further that Organic Cow's particular circumstances did not justify granting it an exemption.

III. *Discussion*

A. *Jurisdiction and Standard of Review*

The federal district court where a handler has its principal place of business has jurisdiction in equity to review the Commission's ruling on a petition for exemption to determine whether it is in accordance with law. *See* Compact, Art. VI, § 16(c). The Compact is silent on the appropriate standard of review.

Congressional consent has transformed the Compact into a law of the United States. *See New Jersey v. New York,* 523 U.S. 767, 811, 118 S.Ct. 1726, 140 L.Ed.2d 993 (1998) (quoting *Cuyler v. Adams,* 449 U.S. 433, 438, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981)). *See also Old Town Trolley Tours of Wash., Inc. v. Wash. Metro. Area Transit Comm'n,* 129 F.3d 201, 203 (D.C.Cir.1997). Although the Com-

pact is the equivalent of a federal law, the Commission is not the equivalent of a federal agency governed by the Administrative Procedures Act ("APA"), however. *See id.*, 129 F.3d at 204. For purposes of judicial review under the APA, an agency is defined as an authority of the Government of the United States. 5 U.S.C.A. § 701(b)(1) (West 1996). The Commission is an authority of the six New England states, not the United States government.

■ Under similar circumstances, the D.C. Circuit adopted the APA standards of review by reference. *See Old Town Trolley Tours*, 129 F.3d at 204. This Court did the same in its previous review the Commission's ruling, *see Organic Cow*, 46 F.Supp.2d at 302, and employs those standards (in relevant part) in this review:

[a] reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law.

5 U.S.C.A. § 706(2) (West 1996). *See also Supreme Oil Co. v. Metro. Transp. Auth.*, 157 F.3d 148, 151 (2d Cir.1998) (per curiam) (choosing APA's abuse of discretion standard in reviewing city agency's decision under Uniform Relocation Assistance and Real Property Acquisition Policies Act). *But see N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n*, 26 F.Supp.2d 249, 259 n. 9 (D.Mass.1998) (finding APA's judicial review standards inapplicable to handler petitions), *aff'd on*

*other grounds*, 198 F.3d 1 (1st Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000).

■ An agency's interpretation of the statute it is empowered to administer is entitled to deference. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[7] *See also Mr. Sprout, Inc. v. United States*, 8 F.3d 118, 122–123 (2d Cir.1993). As the Second Circuit has explained *Chevron's* analytic framework:

[d]etermining whether an agency regulation is a permissible construction of a statute is a two-step process. If the plain language of the statute speaks directly to the issue, the agency regulations must give effect to unambiguously-expressed Congressional intent. If Congress has not directly addressed the issue, however, the court must determine whether the regulation is based on a reasonable interpretation of the statute. Even if the reviewing court would have interpreted the statute differently, an agency's construction will be upheld so long as it is plausible and does not otherwise conflict with Congress' expressed intent.

*Coalition of N.Y. State Career Sch., Inc. v. Riley*, 129 F.3d 276, 279 (2d Cir.1997) (citations omitted). However, a reviewing court "must reject administrative constructions of [a] statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 151, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985) (quoting *F.E.C. v. Democratic*

---

**7.** *Chevron* was a rule-making case, but it has since been applied to agency adjudication. *See, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 574, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). *See also Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

*Senatorial Campaign Com.,* 454 U.S. 27, 32, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981)).

A commission ruling found to be not in accordance with law must be remanded to the commission "with directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires." Compact, Art. VI, § 16(c).

### B. *Procedural Claim*

■■■■■ Organic Cow claims that the two affidavits and attached exhibits submitted by the Commission should have been excluded from the record. It concedes that an administrative record may be reopened,[8] but argues that the failure to afford it any opportunity to confront and cross-examine witnesses violated the APA[9] and its constitutional due process rights.

■■■■■ Whether before a judge or an administrative hearing panel, "a 'fair trial in a fair tribunal is a basic requirement of due process.'" *N.Y. State Dairy Foods Inc. v. Northeast Dairy Compact Comm'n,* 198 F.3d 1, 13 (1st Cir.1999) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955), *cert. denied,* 529 U.S. 1098, 120 S.Ct. 1833, 146 L.Ed.2d 777

(2000). Assuming that a handler has a constitutionally protected property right to seek exemption from the over-order price regulation, *see id.,*[10] the Commission cannot deny the exemption without "appropriate procedural safeguards." *J. Andrew Lange, Inc. v. F.A.A.,* 208 F.3d 389, 392 (2d Cir.2000). The Due Process Clause, however, "is 'flexible and calls for such procedural protections as the particular situation demands.'" *Id.* (quoting *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).[11]

■■■■■ The Compact requires that a handler be afforded "an opportunity for a hearing ... in accordance with regulations made by the [C]ommission." Compact, Art. VI, § 16. Part 1381.4(b) of Title 7 of the Code of Federal Regulations governs the conduct of proceedings before a hearing panel of the Commission. The hearing panel has the discretion to limit the taking of evidence to affidavits and to proceed without conducting an oral hearing, or to require the production by affidavit of additional information necessary to the proper resolution of the matter, but it must notify the petitioner of its decision and the basis for it. *See* 7 C.F.R. § 1381.4(b)(1); (b)(2); (c).

---

**8.** Reopening the record "is one of the courses an agency may follow after a reviewing court has determined that the agency's initial determination included an error of law." *PPG Indus., Inc. v. United States,* 52 F.3d 363, 366 (D.C.Cir.1995) (citing *NLRB v. Food Store Employees Union,* 417 U.S. 1, 10–11, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974)).

**9.** The argument that the procedure followed by the hearing officer violated the APA is easily resolved: the Commission is not an "agency" within the meaning of the APA, *see* 5 U.S.C.A. § 551(1) (West 1996), and is therefore not required to follow APA rules.

**10.** *But see N.Y. State Nat. Org. for Women v. Pataki,* 261 F.3d 156, 164 (2d Cir.2001) (prop-

erty interest contingent on exercise of executive discretion to award does not give rise to legitimate claim of entitlement).

**11.** Three factors are considered in order to determine what procedural protections are required: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value of additional or substitute procedural safeguards; and (3) the fiscal and administrative burdens that the additional or substantive procedures entail." *Furlong v. Shalala,* 238 F.3d 227, 236 (2d Cir.2001). *See also Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. 893.

The hearing panel, in a Notice and Order dated August 9, 1999, permitted Organic Cow and the Commission to file briefs with up to two accompanying affidavits that would present facts or circumstances relevant to the claim for exemption that had arisen since the oral hearing. No additional oral hearing was scheduled. Organic Cow did not object to this procedure at the time, nor has it argued that the panel failed to comply with the Compact's provisions or with the Commission's procedural regulations.

Both Organic Cow and the Commission submitted materials alluding to rule-making proceedings that took place after the January 15, 1998 evidentiary hearing. Following the Commission's submission of its affidavits, Organic Cow moved to exclude them on due process grounds; it did not at any time request an opportunity to cross-examine any witnesses or additional time to submit materials in rebuttal.[12]

The materials submitted by the Commission consisted principally of a summary of the Commissions' records concerning Organic Cow's over-order price obligations and producer price credits (the Ross affidavit with supporting exhibit), and a summary of the Commission's actions regarding organic milk (the Becker affidavit with supporting exhibits). The Becker exhibits included public records of the Commission,[13] materials from rulemaking proceedings in which Organic Cow participated, and materials from Horizon's petition for exemption, *see Horizon Organic Dairy, Inc.,* HEP–97–009 (Jan. 26, 1998).

The Commission's first rejection of Organic Cow's petition for exemption was deficient because the Court was unable to discern the basis for the Commission's refusal to differentiate between organic and nonorganic milk handlers. On remand, the hearing officer re-opened the record to supply that basis from the record of other proceedings before the Commission.

■ Organic Cow complains that it had no opportunity to confront and cross-examine witnesses, essentially arguing that it was entitled to a full evidentiary hearing on remand. An agency "need not conduct an evidentiary hearing when there are no disputed issues of material fact, and ... even where there are such disputed issues, [it] need not conduct such a hearing if they may be adequately resolved on the written record." *Moreau v. F.E.R.C.,* 982 F.2d 556, 568 (D.C.Cir.1993) (citations omitted). *See also J.D. v. Pawlet Sch. Dist.,* 224 F.3d 60, 68 (2d Cir.2000) (when material facts already established by affidavits and documents, adversarial hearing would be waste of administrative resources); Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative law Treatise § 9.5 (3d ed.1994) (distinguishing between legislative and administrative facts).

■ Organic Cow had ample opportunity to make written submissions and oral argument concerning the need for differential treatment of organic milk handlers, either through exemption or a separate over-order price regulation. The facts in dispute concern a policy issue: whether the Commission would determine that dif-

---

12. Organic Cow complained that the order allowing it an opportunity to submit comments on the Commission's submissions gave it insufficient time for a meaningful response. It did not, however, request a hearing or a continuance. Continuances had been consistently granted in the case, at Organic Cow's request.

13. A public record has been defined as "a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." *Wash. Legal Found. v. U.S. Sentencing Comm'n,* 89 F.3d 897, 905 (D.C.Cir.1996).

ferential treatment of organic and nonorganic milk handlers is warranted under the Compact. Given the nature of the facts in dispute, intended to "help the tribunal decide questions of law and policy and discretion," *id.*, there was no need for an additional evidentiary hearing.

Although Organic Cow complains that the materials were submitted after it had filed its opening brief, it has not argued that any of the submitted material came as a surprise. The evidence was familiar to Organic Cow from other proceedings before the Commission in which it participated. Although Organic Cow complains that it was afforded insufficient time to produce an adequate response to the submissions, it did not attempt to proffer any evidence whatsoever in its response that would tend to contradict the Commission's submissions.

Organic Cow had in its original petition presented a substantial case for exemption from the over-order price regulation for organic milk handlers. Upon remand the hearing officer re-opened the record, invited written submissions, and afforded additional opportunity for Organic Cow to respond to the Commission's submissions. Under the circumstances, Organic Cow failed to preserve its due process claim by neglecting to make a proffer or request specific relief; in any event, it has not shown that the procedure followed by the hearing officer denied it due process. *See La. Ass'n of Indep. Producers & Royalty Owners v. F.E.R.C.*, 958 F.2d 1101, 1113–14 (D.C.Cir.1992). The basic elements of due process, notice and an opportunity to be heard, have been satisfied here.

### C. *Merits*

■ The first step in determining whether the Commission's decision not to differentiate between organic and nonorganic milk handlers is allowed by the Com-

pact is to ask whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. *See also Ming Lam Sui v. I.N.S.*, 250 F.3d 105, 113 (2d Cir.2001). Congress has not distinguished between organic and conventional milk in the Compact. "Milk" is defined as "the lacteal secretion of cows . . . includ[ing] all skim, butterfat, or other constituents obtained from separation or any other process. The term is used in its broadest sense and may be further defined by the commission for regulatory purposes." Compact, Art. II, § 2(10). The Compact thus does not require that the Commission treat organic milk differently from nonorganic milk, as Organic Cow concedes, but Congress has empowered the Commission, through the flexible language of the Compact, to determine whether such a distinction is warranted.

■ The second step for a reviewing court is to ask "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. The Commission must be upheld unless its decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Southeast Queens Concerned Neighbors, Inc. v. F.A.A.*, 229 F.3d 387, 395 (2000).

The Compact is intended to supplement existing federal milk marketing orders, *see* Compact, Art. II, § 3(a), and to "appl[y], adapt[ ] and develop[ ] . . . the regulatory techniques historically associated with milk marketing." *Id.*, § 3(b). The Commission is "to take such steps as are necessary to assure the continued viability of dairy farming in the northeast, and to assure consumers of an adequate, local supply of pure and wholesome milk." *Id.*, Art. I, § 1. In setting the over-order price, the Commission is directed to

consider the balance between production and consumption of milk and milk prod-

ucts in the regulated area, the costs of production including, but not limited to the price of feed, the cost of labor including the reasonable value of the producer's own labor and management, machinery expense, and interest expense, the prevailing price for milk outside the regulated area, the purchasing power of the public and the price necessary to yield a reasonable return to the producer and distributor.

*Id.,* Art. IV, § 9(e). Costs of production is thus a significant, but not the sole, factor in determining the over-order price.

The Commission considered the costs of organic milk production and the advisability of exempting organic milk handlers from the over-order obligation. It solicited comments on whether to exempt organic milk handlers from the over-order obligation and to exclude organic milk producers from the producer pool. *See* Notice of Proposed Rulemaking Proceedings, 63 Fed.Reg. 65563 (Nov. 27, 1998). Organic Cow and others submitted written comments and gave oral testimony regarding the costs of organic milk production. *See* Becker Aff.Ex. H. The Commission concluded that the evidence of higher costs for the production of organic milk did not justify separate regulation of organic milk, given the administrative difficulty of establishing separate regulations. *See* Final Order at 12.

The Commission noted additionally that there was record evidence that "the lion's share of differences in the costs of milk production (whether organic or conventional) are related to the farm size of the producer," smaller herd sizes correlating with greater costs of production. *Id.* at 16–17 (citing Becker Aff.Ex. G). The contract price Organic Cow pays to its pro-

ducers, which it contends represents a sustainable price for organic dairy farmers, is a little below the median costs of milk production for dairy farmers with herd sizes similar to the typical Organic Cow producer. The Commission concluded that the record did not support Organic Cow's claim that the costs of organic milk production are so much greater than the costs of nonorganic milk production as to require separate regulatory treatment of organic milk. *See id.* at 17.[14]

The Commission determined that uniform application of the over-order regulation to organic as well as nonorganic milk would better serve the purposes of the Compact. It felt that according different regulatory treatment for organic milk would " 'establish a [regulatory] preference resulting in an economic advantage for organic milk processors.' " *Id.* at 14 (quoting *Horizon Dairy,* HEP–97–009 (Jan. 26, 1998), part II.2.). The Commission "is unwilling to interfere with market forces with regard to subcategories of milk," *id.* at 15, and "is committed to a policy of regulating as 'market-neutrally' as possible with regard to subcategories of milk." *Id.* at 16. Its policy therefore is explicitly to avoid as much as possible changing the relative prices of organic and conventional milk.

To this Court, the Commission's view of its mission and the Compact's purpose is myopic; it minimizes the role that organic dairy farms currently play in maintaining the viability of dairying in the northeast, and ignores their potential to invigorate the industry. Nevertheless, based on the record evidence, this Court cannot say that the Commission's decision to regulate handlers of organic and nonorganic milk uni-

---

14. The Commission also stressed that cost of production was not the sole factor that the Compact directed it to consider in establishing the over-order price regulation. *See* Final Order at 15.

formly is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

 Notwithstanding the Commission's decision not to create a separate over-order price regulation for organic milk or to create a blanket exemption for organic milk handlers, Organic Cow contends that its particular financial circumstances justify exemption. When the over-order price regulations first went into effect in 1997, Organic Cow was experiencing severe financial distress. It had just sold a 70% interest in the corporation to Hood. Two years later, at about the time this Court remanded the case to the Commission, Organic Cow sold its trademark and certain producer contracts to Horizon.

This Court does not doubt that Organic Cow has suffered severe financial difficulties, as recently as 1999. What it has failed to substantiate, however, is that payment of the 1997 and 1998 assessments at issue here pose a threat of extreme financial hardship to the company. Organic Cow is no longer subject to the over-order obligation. Absent from the record is any evidence of Organic Cow's current financial situation, or what effect payment of the outstanding assessments would have on it. If Horizon now owns Organic Cow's producer contracts, then requiring Organic Cow to pay its assessments will not threaten the continued existence of those organic dairy farmers who formerly relied on Organic Cow to process their milk.

The Commission found that Organic Cow failed to carry its burden of demonstrating that payment of the over-order obligation would create unreasonable financial hardship. The Commission did not abuse its discretion in so ruling.

---

15. Because the Commission's ruling is affirmed, this Court does not address Organic Cow's argument that the Commission disobeyed the terms of the Court's escrow order

*CONCLUSION AND ORDER*

For the foregoing reasons, the Commission's June 7, 2000 final ruling is affirmed as in accordance with law. The March 9, 1998 stay is dissolved. The escrowed funds [15] may be disbursed by the Commission pursuant to the Compact and its regulations. *See* 7 C.F.R. § 1381.5(b).

when it ceased escrowing the over-order price obligations after Hood began processing Organic Cow's milk.